1: 13-cv-1124

SEP – 6

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Allen Van Putten as Executor of the Estate of Sharon Van Putten

Vs.

Marilyn Tavenner (personally and as
Administrator of the Centers for
Medicare and Medicaid Services)
Patrick Conway
Nancy O'Connor
J. William Roberson
Timothy Hock
Carrissa Wynder-Sanchez
Erik Bodin
Elizabeth King
Brenda Bagley
Debbie Wintermantel                              CASE NUMBER:
Mary Berryman                                    CIVIL DIVISION
Inova Health Care Services, Inc., d/b/a
Inova Fairfax Hospital, dba Inova Fair Oaks Hospital
d/b/a Inova Health System,
Patrick Christiansen
Aamir Latif
Greg Wagner
Eugene Kim Lee a/k/a Eugene Kim, a/k/a Eugene Lee
Kevin Mahaney
Clifford Lader
Christian Muller
Philip Minshew
Belay Atnafu
Jason Williams
Ellen Vaughey
Matthew Williams
Robert Bloom
Eric Libre

1

James Lamberti
Thomas McCabe
Mark Granada
Muliya Gowda
Christine Bussey
Barry DiCicco
Marla Shuman
Sabrena Tangri
Gregory Trimble
David Duncan
Patricia McCray
Kate Roman

And the Commonwealth of Virginia (for injunctive relief purposes only)

Defendants

## COMPLAINT AND JURY DEMAND

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed or dismissed or transferred after having been assigned a judge.

NOW COMES Plaintiff Allen Van Putten, as Executor for the Estate of Sharon Van Putten for the estate's Complaint against Marilyn Tavenner, Patrick Conway, J. William Roberson, Nancy O'Connor, Timothy Hock, Carissa Sanchez, Debbie Wintermantel, Mary Berryman, Brenda Bagley, Erik Bodin, Elizabeth King, Inova Health Care Services, Inc. d/b/a Inova Fairfax and Inova Fair Oaks, Patrick Christiansen, Aamir Latif, Greg Wagner, Eugene Kim Lee, Kevin Mahaney, Clifford Lader, Christian Muller, Philip Minshew, Belay Atnafu, Jason Williams, Ellen Vaughey, Matthew Williams, Robert Bloom, Eric Libre, James Lamberti, Thomas McCabe, Mark Granada, Muliya Gowda, Christine Bussey, Barry

DiCicco, Marla Shuman, Sabrena Tangri, Gregory Trimble, David Duncan, Patricia McCray, Kate Roman and the Commonwealth of Virginia hereby states:

## I.  JURISDICTION AND VENUE

1.  Plaintiff Allen Van Putten, Executor, brings this action under the Administrative Procedures Act 5 USC §702, 42 USC §1983, the United States Constitution and <u>Bivens v. Six Unnamed United States Agents</u>, 403 US 388 (1978). The Court has jurisdiction pursuant to the following statutes:

>   a.   28 U.S.C. §1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States;

>   b.   28 U.S.C. § 1343 (3) and (4), which gives district courts jurisdiction over actions to secure civil rights extended by the United States government;

2.  Venue is appropriate in this judicial district under 28 U.S.C. § 1391 (b) because the events that gave rise to this Complaint occurred in this district.

## II. PARTIES

3.  Sharon Van Putten was a citizen of the United States residing in Naples, Florida, from about May 17, 2011 to November 9, 2011, the date of her death.

4.  Allen Van Putten is citizen of the United States residing in Naples, Florida.

5.  Marilyn Tavenner is the Administrator for the Center for Medicare and Medicaid Services (CMS or Medicare) and is sued in her official capacity as Administrator for CMS. As the CMS Administrator, Defendant Tavenner has a duty to ensure that the Medicare program is administered in accordance with federal and state law. Marilyn Tavenner is also sued herein in her personal capacity for personally failing to provide appropriate oversight to the VHQC (Virginia QIO), the contracted Quality Improvement Organization for the Commonwealth of Virginia and the Virginia State Survey Agency that is a Medicare contractor. Ms. Tavenner is a resident of Amelia County, Virginia.

6.   Patrick Conway is the Chief Medical Officer for Medicare and he is being sued in his personal capacity for personally obstructing Sharon Van Putten's access to justice, for personally failing to provide appropriate oversight to the Virginia QIO and for failure to properly train staff. Patrick Conway is a resident of Howard County, Maryland.

7.   Upon information and belief, J. William Roberson is a resident of Massachusetts and is sued in his personal capacity. He personally condoned the violation of Sharon Van Putten's rights, obstruction of access to justice, and failed to properly train staff as the Associate Regional Administrator from the CMS Philadelphia Region and as the Director of the Northeast Division Survey and Certification.

8.   Nancy O'Connor is a resident of Camden County, New Jersey and is sued in her personal capacity. She personally condoned the violation of Sharon Van Putten's civil rights, obstructed justice and failed to properly train and supervise staff in response to specific complaints and requests to her while acting as the CMS Regional Director.

9.   Timothy Hock is sued in his personal capacity as he personally condoned the violation of Sharon Van Putten's civil rights, obstructed justice and failed to properly train and supervise staff in response to specific complaints and requests to him while acting as Certification and Enforcement Branch Manager in the CMS Philadelphia Regional Office. He is, upon information and belief, a resident of Chester County, Pennsylvania.

10. Carrissa Wynder-Sanchez is sued in her personal capacity as she personally condoned and ordered the violation of Sharon Van Putten's civil rights, obstructed justice and failed to properly train and supervise staff/contractors despite multiple requests to that she do so.  She is, upon information and belief, a resident of Montgomery County, PA.

11. Defendants Marilyn Tavenner, Patrick Conway, J. William Roberson, Nancy O'Connor, Timothy Hock and Carissa Sanchez are collective referred to as the "Medicare Defendants".

12. Debbie Wintermantel, a/k/a Sonja D. Wintermantel, is sued in her personal capacity as she personally participated in the violation of Sharon Van Putten's civil rights and obstructed justice. She is, upon information and belief, a resident of York County, Virginia.

13. Mary Berryman is sued in her personal capacity as she personally participated in the violation of Sharon Van Putten's civil right and obstructed justice. She is, upon information and belief, a resident of Henrico County, Virginia.

14. Brenda Bagley is sued in her personal capacity as she personally participated in the violation of Sharon Van Putten's civil rights and obstructed justice. She is, upon information and belief, a resident of Henrico County Virginia.

15. Erik Bodin is sued in his personal capacity as he personally participated in the violation of Sharon Van Putten's civil rights and obstructed justice. He is, upon information and belief, a resident of Henrico County Virginia

16. Elizabeth King is sued in her personal capacity as she personally participated in the violation of Sharon Van Putten's civil right and obstructed justice. She is, upon information and belief, a resident of Henrico County, Virginia.

17. Defendants Debbie Wintermantel, Mary Berryman, Brenda Bagley, Eric Bodin and Elizabeth King are referred to collectively as the "Virginia DOH Defendants."

18. Inova Health Care Services, Inc. is a Virginia Corporation with a primary place of business of 8110 Gatehouse Drive, Fairfax, Virginia, 22042. Inova Health Care Services has the d/b/a of Inova Fairfax Hospital ('Inova Fairfax") and Inova Fair Oaks ("Inova Fair Oaks").

19. Patrick Christiansen, was the Chief Operating Office of Inova Fairfax while Sharon Van Putten was there as a patient. He condoned horrific treatment that he agreed constituted criminal abuse in a meeting with Sharon Van Putten's family. In retaliation for those complaints, he acted to deprive Sharon Van Putten of access to medical care by means of fraud.

    a.   Specifically, he and David Duncan are documented in Sharon Van Putten's medical records as approving what medical records would be provided in response to Sharon Van Puttens request for records at discharge, under HIPAA. The records provided were scrubbed to remove any reference to lung cancer or multi-drug resistant Klebsiella, putting Sharon Van Putten and other patients at substantial risk.

    b.   Despite findings from the Virginia Department of Health (the unaltered version) and the Virginia QIO that found nearly every single one of the complaints about Sharon Van Putten's care to have been substantiated, Patrick Christiansen, now CEO of Inova Fairfax, irrationally remains adamant that the care Inova provided met professional standards.

    c.   The Virginia QIO is a Medicare contractor charged with statutory regulatory responsibility of assessing whether care provided to Medicare beneficiaries meets minimum standards.

20. Aamir Latif is a doctor at Inova Fair Oaks who failed to provide screening and treatment required under EMTALA, who was cleared by the Virginia QIO based on misleading information which Sharon Van Putten did not have the opportunity to dispute. The Virginia QIO found Dr. Latif's care failed to meet minimum professional standards with respect to follow up of a lung tumor, which later proved to be lung cancer. Upon information and belief, he is a resident of Loudoun County, Virginia.

6

21. Greg Wagner is a doctor at Inova Fair Oaks who failed to provide screening and treatment required under EMTALA, who was cleared by the Virginia QIO of an EMTALA violation because of fraudulent entries he made in Sharon Van Putten's medical record, which information Sharon Van Putten did not have the opportunity to dispute. Dr. Wagner's care failed to meet minimum professional standards with respect to follow up of a lung tumor, which later proved to be lung cancer, which was so found by the Virginia QIO.  Greg Wagner is, upon information and belief, a resident of Prince William County, Virginia.

22. Eugene Kim Lee, a/k/a Eugene Kim, a/k/a Eugene Lee was a doctor at Inova Fairfax. He participated in care to Sharon Van Putten that failed to meet minimum professional standards, rendering her a paraplegic.  He also authorized a gross overdose of steroids, illegal chemical and physical restraints, and his unprofessional care resulted in a deep bedsore. He also failed to follow up on a lung tumor, noted as requiring follow up, resulting in death by lung cancer.  His exact residence is unknown, but he has responded to correspondence addressed to him at Inova Fairfax.

23. Kevin Mahaney is an emergency room physician at Inova Fairfax. He participated in care that the Virginia QIO found did not meet minimum professional standards with respect to the excessive delay in surgery Sharon Van Putten experienced, resulting in paraplegia. He is, upon information and belief, a resident of the District of Columbia.

24. Clifford Lader is a radiologist at Inova Fairfax. He participated in care that the Virginia QIO found did not meet minimum professional standards with respect to the excessive delay in surgery Sharon Van Putten experienced, resulting in paraplegia. Upon information and belief, Clifford Lader is a resident of Montgomery County, MD.

7

25. Christian Muller is a radiologist at Inova Fairfax. He participated in care the Virginia QIO found did not meet minimum professional standards with respect to the excessive delay in surgery Sharon Van Putten experienced, resulting in paraplegia. Christian Muller is, upon information and belief, a resident of Fairfax County, Virginia.

26. Philip Minshew is a radiologist at Inova Fairfax. He participated in care the Virginia QIO found did not meet minimum professional standards with respect to the excessive delay in surgery Sharon Van Putten experienced, resulting in paraplegia. Philip Minshew is upon information and belief, a resident of Montgomery County, Maryland.

27. Belay Atnafu is a hospitalist at Inova Fairfax. Belay Atnafu participated in care the Virginia QIO found did not meet minimum professional standards with respect to the excessive delay in surgery Sharon Van Putten experienced, resulting in paraplegia. Belay Atnafu is, upon information and belief, a resident of Fairfax County, Virginia.

28. Jason B. Williams was a psychiatry resident at Inova Fairfax. Representing himself as an attending physician and apparently unsupervised by any Inova attending physician (required under Virginia law), he ordered, on several occasions, powerful, mind-altering antipsychotics to be administered to Sharon Van Putten despite written refusals of such drugs. He refused to consider the possibility of a massive drug overdose despite many entreaties by Sharon Van Putten's family, which are documented in Sharon Van Putten's medical record. He is, upon information and belief, a resident of Fauquier County, Virginia.

29. Ellen Vaughey is a pulmonologist at Inova Fairfax. She participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death. Ellen Vaughey personally participated in depriving Sharon Van Putten of nutrition for a week. The location of

8

Ellen Vaughey's residence is unknown, but her principal place of business is in Fairfax County, Virginia.

30. Matthew Williams is a pulmonologist at Inova Fairfax. He participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death. Matthew Williams' residence is in Fairfax County. Virginia.

31. Robert Bloom is a pulmonologist at Inova Fairfax. He participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death. Robert Bloom also wrongfully deprived Sharon Van Putten of nutrition for a week, with the reason for doing so noted in a federal report being that Sharon Van Putten was a paraplegic. Robert L. Bloom's residence is unknown, but his principal place of business is in Fairfax County. Virginia.

32. Eric Libre is a pulmonologist at Inova Fairfax. He participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death. He also participated in wrongfully depriving Sharon Van Putten of nutrition for a week. Eric Libre is a resident of Fairfax, Virginia.

33. James Lamberti is a pulmonologist at Inova Fairfax. He participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death. He also participated in wrongfully depriving Sharon Van Putten of nutrition for a week. Upon information and belief, James Lamberti is a resident of Fairfax County, Virginia.

34. Thomas McCabe is a pulmonologist at Inova Fairfax. He participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death. Upon information and belief, Thomas McCabe is a resident of Arlington County, Virginia.

35. Mark Granada is a pulmonologist at Inova Fairfax. He participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death. He also participated in wrongfully depriving Sharon Van Putten of nutrition for a week. Upon information and belief, his residence is unknown, but his principal place of business is in Fairfax County Virginia.

36. Murliya Gowda is an infectious disease specialist at Inova Fairfax. She participated in wrongfully depriving Sharon Van Putten of nutrition for a week and participated in infectious disease control that did not meet Medicare Conditions of Participation, as found by the Virginia Department of Health. Upon information and belief, her residence is unknown, but her principal place of business is in Fairfax Virginia.

37. Christine Bussey is a cardiologist at Inova Fairfax. She participated in wrongfully depriving Sharon Van Putten of nutrition for a week and failed to require the provision of nutrition to Sharon Van Putten even after Sharon Van Putten suffered a heart attack due to inadequate nutrition. Upon information and belief, her residence is unknown, but her principal place of business is in Fairfax County, Virginia.

38. Barry DiCicco is a pulmonologist at Inova Fairfax and is Vice President of the Inova Fairfax medical staff.

a. He participated in care the Virginia QIO did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death.

b. He personally documented that the lung cancer was a "pseudotumor" requiring no follow up, with no basis for that determination and in the face of extensive documentation in the medical records by other doctors that they believed that Sharon Van Putten was likely suffering from undiagnosed, unstaged and untreated lung cancer.

c. This notation directing no further follow up care occurred contemporaneous with the conclusion of the Van Putten family meeting with Inova Fairfax COO Patrick Christiansen.

d. Upon information and belief, that action was taken in specific retaliation for the Van Putten family complaining to Inova and Medicare about Inova's failure to provide care that met minimum professional standards and its violation of the Conditions of Participation.

e. Upon information and belief, Barry DiCicco is a resident of Fairfax County, Virginia.

39.    Marla Shuman is a pulmonologist at Inova Fairfax and partner of Barry DiCicco. She participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death. She also participated in care the Virginia QIO found did not meet minimum professional standards with respect to a severe pressure ulcer that had green oozing discharge and was open down to Sharon Van Putten's spine. Upon information and belief, she is a resident of Fairfax County, Virginia.

11

40.    Sabrena Tangri was a hospitalist at Inova Fairfax.  She participated in care the Virginia QIO did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death.  She also participated in care that failed to meet minimum professional standards with respect to the failure to treat a severe pressure ulcer. Upon information and belief, she is a resident of Cook County, Illinois. Her principal place of business is also in Cook County, Illinois.

41.    Gregory Trimble was a hospitalist at Inova Fairfax.  He participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death.  He also failed to disclose that Sharon Van Putten had an unstable cardiac condition (due to the growing lung tumor producing a gallon of fluid that was pressing on the heart) and that she had a multi-drug resistant Klebsiella infection, putting all residents of the facility that accepted Sharon Van Putten at risk of death due to this exceptionally virulent pathogen.  Upon information and belief, he is a resident of Arlington, Virginia.

42.    David Duncan is a doctor at Inova Fairfax and was at the time of these events the Head of Case Management and Utilization for Inova Fairfax. He participated in care the Virginia QIO found did not meet minimum professional standards with respect to absent disclosure of the growing lung tumor resulting eventually in Sharon Van Putten's death.  Specifically, he and Patrick Christiansen are documented in Sharon Van Putten's medical records as approving what medical records would be provided in response to Sharon Van Putten's request for records at discharge, under HIPAA. The records provided were scrubbed to remove any reference to lung cancer or multi-drug resistant Klebsiella, putting Sharon Van Putten and other patients at substantial risk.

12

43.     Patricia McCray was a wound care nurse at Inova Fairfax. The Virginia QIO found her to have participated in care that did not meet minimum professional standards with respect to the care of a severe pressure ulcer that eventually went to the spine.  Upon information and belief, she is of unknown address.

44.     Kate Roman is the head administrative nurse at Inova Fairfax. She personally participated in conduct which the Virginia QIO found did not meet minimum professional standards with respect to a delay in surgery for a spinal cord injury, the failure to properly assess and treat a severe pressure ulcer and with respect to the failure to disclose a growing lung tumor that proved to be lung cancer. Upon information and belief, she is a resident of Fairfax County, Virginia.

45.     The Defendants named in paragraphs 18-45 are hereby collectively referred to as the "Inova Defendants."

## III. SURVIVAL OF ACTION

46.     Both Virginia (the location of the violation of rights) and Florida (the location of Sharon Van Putten's death) provides for the survival of causes of action after death.

## IV. GENERAL ALLEGATIONS

### IV. A.  HOSPITAL OBLIGATIONS UNDER MEDICARE CONTRACTS

47.     42 U.S.C. 1395d, part of the Social Security Act conferring the right to Medicare benefits provides:

> (a) The benefits provided to an individual by the insurance program under this part shall consist of entitlement to have payment made on his behalf or, in the

case of payments referred to in section 1814(d)(2) to him (subject to the provisions of this part) for—
(1) inpatient hospital services or inpatient critical access hospital services for up to 150 days during any spell of illness minus 1 day for each day of such services in excess of 90 received during any preceding spell of illness (if such individual was entitled to have payment for such services made under this part unless he specifies in accordance with regulations of the Secretary that he does not desire to have such payment made);

48.     Sharon Van Putten was entitled to Medicare benefits.

49.     42 USC §1395a provides that any individual entitled to Medicare benefits may obtain health services from any institution, agency, or person qualified to participate under this title if such institution, agency, or person undertakes to provide him such services. This choice is characterized in the regulations as a "right."

50.     The Center for Medicare and Medicaid Services (CMS) and Inova are parties to a contract whereby Inova is to provide qualified inpatient hospital services pursuant to 42 U.S.C. §1395d.

51.     Federal regulations set forth mandatory provisions of that contract (Conditions of Participation) which are intended ensure the provision of health and safety of the individuals who are furnished services in hospitals. These Conditions of Participation include:

a.      A governing body that is legally responsible for services furnished in the hospital whether or not they are furnished under contracts. The governing body must ensure that the services performed under a contract are provided in a safe and effective manner.42 CFR 482.12

        i.  The hospital's corporate responsibility for the quality of care provided is also emphasized in the Condition of Participation –Medical Staff, "The hospital must have an organized medical staff that operates under bylaws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital." 42 CFR 482.22

14

b.    Drugs must be administered in accordance with state and federal law: "Drugs and biologicals must be prepared and administered in accordance with Federal and State laws, the orders of the practitioner or practitioners responsible for the patient's care as specified under §482.12(c), and accepted standards of practice." 42 CFR 482.23

c.    There must be a hospital procedure for reporting transfusion reactions, adverse drug reactions, and errors in administration of drugs. 42 CFR 482.23

d.    The hospital must have available diagnostic radiologic services.  42 CFR 482.26

e.    Patient nutritional needs must be met.  42 CFR 482.28

f.    The hospital must provide a sanitary environment to avoid sources and transmission of infections and communicable diseases. There must be an active program for the prevention, control, and investigation of infections and communicable diseases. 42 CFR 482.42.

g.    "The hospital must provide a discharge planning evaluation to the patients upon the patient's request, the request of a person acting on the patient's behalf, or the request of the physician. The hospital personnel must complete the evaluation on a timely basis so that appropriate arrangements for post-hospital care are made before discharge, and to avoid unnecessary delays in discharge. The hospital must arrange for the initial implementation of the patient's discharge plan." 42 CFR 482.43.

h.    The hospital must provide any receiving facility or the patient with sufficient information to allow for follow-up as part of the discharge process: "The hospital must transfer or refer patients, along with necessary medical information, to appropriate facilities, agencies, or outpatient services, as needed, for follow up or ancillary care." 42 CFR 482.43. (emphasis added)

i.      The hospital must transfer or refer patients, along with necessary medical information, to appropriate facilities, agencies, or outpatient services, as needed, for follow up or ancillary care. 42 CFR 482.43.

j.      The hospital must provide for appropriate nursing services. 42 CFR 482.23.

k.   The hospital must comply with state, local and federal law regarding patient safety. 42 CFR 482.11.

l.      The hospital must develop, implement, and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement program. Under this condition, the hospital must track adverse patient events.  42 CFR 482.21

m.   The hospital must maintain necessary medical records in an easily retrievable format. 42 CFR 482.24.

n.      The Conditions of Participation provide for the following Patient Rights:

(1) A hospital must inform each patient, or when appropriate, the patient's representative (as allowed under State law), of the patient's rights, in advance of furnishing or discontinuing patient care whenever possible.

(2) The hospital must establish a process for prompt resolution of patient grievances and must inform each patient whom to contact to file a grievance. The hospital's governing body must approve and be responsible for the effective operation of the grievance process and must review and resolve grievances, unless it delegates the responsibility in writing to a grievance committee. The grievance

process must include a mechanism for timely referral of patient

concerns regarding quality of care.

(3) The patient has the right to participate in the development and

implementation of his or her plan of care. The patient or his or her

representative (as allowed under State law) has the right to make

informed decisions regarding his or her care. The patient's rights

include being informed of his or her health status, being involved in

care planning and treatment, and being able to request or refuse

treatment.

(4) The patient has the right to be free from all forms of abuse or

harassment.

(5) The patient has the right to access information contained in his or her

clinical records within a reasonable time frame. The hospital must not

frustrate the legitimate efforts of individuals to gain access to their

own medical records and must actively seek to meet these requests as

quickly as its recordkeeping system permits.

(6) The patient has the right to be free from restraints of any form that are

not medically necessary or are used as a means of coercion, discipline,

convenience, or retaliation by staff. The term "restraint" includes

either a physical restraint or a drug that is being used as a restraint. A

drug used as a restraint is a medication used to control behavior or to

restrict the patient's freedom of movement and is not a standard

treatment for the patient's medical or psychiatric condition. A restraint

can only be used if needed to improve the patient's well-being and less

restrictive interventions have been determined to be ineffective. The

use of a restraint must be selected only when other less restrictive

measures have been found to be ineffective to protect the patient or

others from harm; In accordance with the order of a physician or other

licensed independent practitioner permitted by the State and hospital to

order a restraint. This order must (i) Never be written as a standing or

on an as needed basis (that is, PRN); and (ii) be followed by

consultation with the patient's treating physician, as soon as possible,

if the restraint is not ordered by the patient's treating physician; (iii) In

accordance with a written modification to the patient's plan of care;

(iv) implemented in the least restrictive manner possible; in

accordance with safe and appropriate restraining techniques; and (vi)

Ended at the earliest possible time. 42 CFR 482.13

52.    These provisions are mandatory, not hortatory, "A hospital must protect and promote

each patient's rights." 42 CFR 482.13.

53.    Medicare has two primary means by which patients can seek redress of a hospital's

failure to meet the Conditions of Participation – State Surveys and the Quality Improvement

Organizations' Beneficiary Complaint Review.

## IV.B. MEDICARE STATE SURVEY REQUIREMENTS

54.    CMS contracts with State Survey organizations to perform surveys and make

recommendations regarding the Conditions of Participation, conduct validation surveys of

accredited facilities as provided in 42 CFR § 488.7 and perform other surveys and carry out other appropriate activities and certify their findings to CMS. 42 CFR 488.11.

55.    CMS may request a State Survey Agency (SSA) to perform an investigation in response to allegations that are "substantial allegations of noncompliance" with the Conditions of Participation for hospitals accredited through a "deeming process.' 42 CFR 488.1.

56.    Both Inova Fairfax and Inova Fair Oaks are accredited with Medicare through a deeming process.

57.    Medicare has promulgated extensive guidance to govern State Survey processes and the participation of providers in the Medicare program. This guidance is known as the "State Operations Manual" (SOM).

58.    The primary goal of Medicare's complaint investigation system is "protective oversight." SOM Chapter 5, Section 5000.1.

59. Under Medicare Program Guidance, CMS Programs Officers may not delegate a complaint against a "deemed" hospital to an SSA unless CMS has determined that the complaint is a substantial allegation of non-compliance at a "condition level". SOM Chapter 5, Section 5100.1. SSA agencies must obtain approval from CMS before investigating a complaint of a "deemed" hospital. SOM Chapter 5, Section 5070.

60. Substantial allegations of non-compliance are defined as, "a complaint from any of a variety of sources (including complaints submitted in person, by telephone, through written correspondence, or in newspaper or magazine articles) that, if substantiated, would affect the health and safety of patients and raises doubts as to a provider's or supplier's noncompliance with any Medicare condition. 42 CFR 488.1.

61. "Condition level" is a non-compliance that is so serious that it can result in termination of a hospital's contract with Medicare.

### IV. C.  STATE SURVEY--IMMEDIATE JEOPARDY REQUIREMENTS

62. A complaint received against a facility must be reviewed by the Medicare Regional Office to determine if it alleges "Immediate Jeopardy" in which case immediate investigation is required and, if the complaint is substantiated, immediate remediation is required. The regulations at 42 CFR 489.3 define Immediate Jeopardy as "A situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 CFR 489.3.

63. Appendix Q to the SOM contains "Guidelines for Determining Immediate Jeopardy." It provides: "The goal of the survey process is to ensure the provision of quality care to all individuals receiving care or services from a certified Medicare/Medicaid entity. The identification and removal of Immediate Jeopardy, either psychological or physical, are essential to prevent serious harm, injury, impairment, or death for individuals.

> • Only ONE INDIVIDUAL needs to be at risk. Identification of Immediate Jeopardy for one individual will prevent risk to other individuals in similar situations.
>
> • Serious harm, injury, impairment, or death does NOT have to occur before considering Immediate Jeopardy. The high potential for these outcomes to occur in the very near future also constitutes Immediate Jeopardy.

"Individuals must not be subjected to abuse by anyone including, but not limited to, entity staff, consultants or volunteers, family members or visitors.

> • Serious harm can result from both abuse and neglect.
>
> • Psychological harm is as serious as physical harm."

64. 42 CFR 488.301 defines neglect "Failure to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness."

65. 42 CFR 488.301 defines abuse as, "The willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain, or mental anguish."

66. If a patient has been abused or neglected, a state inspector must consider citing the hospital at an immediate jeopardy level: "Any time a team cites abuse or neglect, it should consider Immediate [Jeopardy]."

67.

68. Appendix Q to the State Operation Manual provides an assessment matrix for Immediate Jeopardy. Inspectors are to review whether harm has occurred, if that harm meets the definition of Immediate Jeopardy, is the harm likely to recur, did the facility have knowledge of the situation, when did the facility discover the situation, did the facility thoroughly investigate the situation, did the facility implement corrective measures.

69. Intakes are assigned the priority of Immediate Jeopardy if the alleged noncompliance indicates immediate corrective action is necessary. SOM Chapter 5, Section 5075.1.

70. One of the prime examples of "Immediate Jeopardy" in the handbook is depriving a patient of food and hydration without family permission or an advanced directive, even if no harm occurred.

71. If Immediate Jeopardy is found, the state inspection team should notify the administration of the hospital of the Immediate Jeopardy. "A verbal notice should be given with the specific details, including the individuals at risk, before the survey team leaves the premises of the entity. **The entity should begin immediate removal of the risk to individuals, and immediately implement corrective measures to prevent repeat Jeopardy situations. The team should**

**encourage the entity to provide evidence of their implementation of corrective measures**."
(Emphasis in the original).

72. In other words, inspectors have a specific duty to protect patients who are put at risk of an Immediate Jeopardy violation to ensure that the risk is immediately removed.

73. Appendix Q requires that state survey teams document separately what a facility has done to correct an Immediate Jeopardy and to verify the implementation of that correction on Form 2567B, which is a document that must be disclosed under FOIA to the public.

74. Appendix Q provides that a survey team may not find a hospital in compliance and not issue a citation of Immediate Jeopardy simply because hospital alleges it has remediated the deficiency during the survey. Rather, the fact of the implementation of remediation must be verified by the state survey team.

75. If there is a disagreement between the state surveyors and the CMS Regional Office as to whether there is Immediate Jeopardy present at a facility, the SOM's prescribed means to resolve that dispute is a joint state/federal survey, not altering documents:

> "If the RO disagrees based upon its review of the documentation, the RO discusses the results of the review with the SA and solicits further evidence to support the SA's recommendation. The RO confers with the SA as to the appropriate action to be taken. Should the RO and the SA fail to agree that an immediate jeopardy exists, a revisit will be conducted by the RO and the SA together to ascertain whether or not immediate jeopardy to the patient's health and safety exists or has been removed. If the RO and SA agree that an immediate jeopardy exists, no revisit is necessary by the RO. Under no circumstances should the RO reverse a SA recommendation that an immediate jeopardy has been removed or not removed unless the determination is made on the basis of an onsite determination by Federal surveyors. Section 3011.

76. The State Operations Manual indicates that where CMS finds an Immediate Jeopardy to patient health and safety is found, whether in the course of a scheduled Federal monitoring survey, in response to a complaint, or as part of sample validation efforts of an accredited entity,

the CMS Regional office must initiate termination procedures to terminate the hospital from the

Medicare Program. Medicare State Operations Manual, Chapter 3, Section 3005f.

77. If there is an Immediate Jeopardy to patient health or safety documented, either the

hospital must correct the deficiency and the SSA must document compliance, or the hospital

must be terminated from the Medicare program within 23 calendar days.  SOM Chapter 3,

Section 3010A.

78. Therefore, either it must be proved and documented that the hospital is no longer putting

patients at risk or the hospital is not a qualified provider under Medicare regulations.

## IV.D. STATE SURVEY – CONDITIONS OF PARTICIPATION

79. CMS/Medicare bases its determination of whether a hospital meets the Conditions of

Participation based on the SSA's recommendations.  42 CFR 488.12.

80. Medicare requires that SSA Investigations be done in a professional manner, with

professional documentation, and with impartiality. "Investigation:

- The investigation must be conducted in an impartial, objective manner to obtain accurate data sufficient to support a reasonable conclusion.
- Observation is a key component of any investigation. All observations need to be thoroughly documented. Be specific in noting time, location and exact observations.
- The interview notes must be clear and detailed. The documentation should include the full name of the person interviewed. The time and date of the interview should be documented. Any witnesses present should be indicated.
- Record review is used to support observations and interviews. Obtain copies of relevant documentation supporting the Immediate Jeopardy as you investigate (e.g., nurses' notes, and investigation reports).
- If the case involves a potential criminal action, the surveyor should be aware that any physical evidence must be preserved for law enforcement agencies."

81. If a SSA finds that hospital is not in compliance with the Conditions of Participation, it

must specifically document its findings and the basis for that recommendation:

"(a) The findings of the State agency with respect to each of the conditions of participation, requirements (for SNFs and NFs), or conditions for coverage must be adequately documented. When the State agency certifies to the Secretary that a provider or supplier is not in compliance with the conditions or requirements (for SNFs and NFs), and therefore not eligible to participate in the program, such documentation includes, in addition to the description of the specific deficiencies which resulted in the agency's recommendation, any provider or supplier response." 42 CFR 488.18

82. If a hospital is found not to be in compliance with the Conditions of Participation, the SSA will forward recommendations to the CMS Regional Office ("RO"), which will review the SSA documentation. If the RO concurs, it will begin the process of terminating the provider's contract with Medicare. SOM Chapter 5, Section 5002.1. If a hospital is found to be deficient with respect to one or more of the standards in the Conditions of Participation or conditions for coverage, it may participate in or be covered under Medicare only if the hospital has submitted an acceptable plan of correction for achieving compliance within a reasonable period of time acceptable to the Secretary. 42 CFR 488.28.

83. The SOM requires that a plan of correction demonstrate how the hospital will remediate the harm to the patients who were found harmed by the hospital's deficiencies, "In order for a PoC [Plan of Correction] to be acceptable, it must include the following elements: 1. Core Elements of PoC: a. How the corrective action will be accomplished for individuals found to have been affected by the deficient practice;" SOM chapter 3, Section 3006.5.

84. The Plan of Correction must be documented on Form 2567, which is publically available by FOIA, and Medicare must verify the plan has been implemented on Form 2567.

85. The inspection report, plan of correction and Medicare's verification must all be provided to the original complainant.

86. If the SSA finds a hospital to be in compliance with the Conditions of Participation, but with minor deficiencies that do not adversely affect the health and safety of patients, the SSA

report to CMS must include: (i) a statement of the deficiencies that were found; (ii) a description of further action that is required to remove the deficiencies; (iii) a time-phased plan of correction developed by the provider and supplier and concurred with by the State agency; and (iv) a scheduled time for a resurvey of the institution or agency to be conducted by the State agency within 90 days following the completion of the survey.

87. If the hospital does not remediate violations of the Conditions of Participation, commencement of the procedure to terminate the contract is accompanied by a public notice in local newspapers. 42 CFR 489.

88. Accordingly, if any deviation from Medicare's requirements is found, the SSA must document the deviation and require the provider (hospital) to demonstrably prove the deviation has in fact been corrected.

89. If a hospital or provider is in violation of the Conditions of Participation or other statutory/regulatory requirements, its contract is to be terminated, under 42 CFR 489.

## IV. E. STATE SURVEY –DOCUMENTATION

90. Exhibit 7-A to the SOM provides detailed instructions as to how to document an inspection.

91. Exhibit 7-A to the SOM defines a "Deficient Practice" as "the action(s), error(s), or lack of action on the part of the entity relative to a requirement (and to the extent possible, the resulting outcome)."

92. Exhibit 7-A to the SOM recognizes that state survey documentation is an integral part of a legal administrative process and is therefore stringently regulated:

"The survey and certification of an entity that participates in Medicare, Medicaid or the Clinical Laboratory Improvement Amendments (CLIA) of the Public Health Service Act, is a

process that must adhere to legal requirements. These programs are administered under extensive laws, regulations, operation manuals and other guidelines. Surveys and the documentation from surveys become an important part of subsequent legal proceedings arising out of the certification process....The survey process determines, and the documentation records, the compliance or noncompliance of providers, suppliers, and CLIA laboratories. The surveyor provides the reasons justifying any resulting enforcement action and the record on which to defend that action in the appeals process. Consistent and accurate documentation is imperative in the entire certification process as it forms the basis for the record and the certification decision. Moreover, the documentation may also be reviewed in any subsequent appeal, i.e., reconsideration, hearing before an Administrative Law Judge (ALJ) of the Departmental Appeals Board (DAB), review by the Board's Appellate Division, and judicial review."

93. Surveyor reports constitute official findings of the both the State and United States

Government:

"A certification of compliance or noncompliance with the applicable requirements by the State agency or the Federal Government is an official finding and determines whether or not the provider or supplier may participate in the Medicare or Medicaid program or whether a laboratory is issued a certificate to operate under CLIA. It also determines whether any of these entities are subject to other sanctions. The decision-making process and subsequent certifications are based on the documentation of the survey in the Statement of Deficiencies (Form CMS-2567), as well as, other documentation such as surveyor worksheets or notes."

94. Exhibit 7-A contemplates that surveyor notes and worksheets, as well as reports,

constitute evidence in administrative proceedings related to facility compliance:

"The evidence must provide the underlying reason, basis or rationale for the findings of noncompliance with the regulatory requirement(s). Such a hearing is an adversarial proceeding. At the hearing, witnesses testify for both the entity and for CMS, and are subject to cross-examination. The primary evidence is the Form CMS-2567, and any other documentation used to make the determination of survey results (e.g., worksheets, narratives, etc.)."

95. Exhibit 7-A reinforces that state surveyors are not to document corrections of deficiencies

or omit the documentation of deficiencies because a facility alleges that it has corrected a

deficiency. Rather, the facility is to document its allegations of correction in a separate section of

the report form designated for the facility response (a Form 2567).

96. The SOM is clear that supervisors within a state survey agency may not alter the findings of the surveyors – any changes to the surveyors conclusions must be documented in a verifiable and transparent manner:

> "The SA reviews the current survey report or required forms to ensure that all items are properly completed. **If there are any changes or erasures, the SA initials the item and explains the basis for the modification in the explanatory remarks column**. The SA includes the following information in the explanatory remarks column for each item "not met":
> • A description of the deficiency;
> • Whether the deficiency existed during the previous survey and whether compliance was achieved, and then not sustained; and
> • Current PoCs, if any.
> In addition, the SA includes with the package an estimate of whether there is a prospect of compliance with all eligibility requirements within the time limits and the basis for this opinion.

SOM Chapter 3, Section 3018.(emphasis added)

97. The crime of obstruction of justice applicable to these records is set forth in 18 USC §1519:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

## IV. F. QUALITY IMPROVEMENT ORGANIZATIONS

98. A QIO is required by statute and regulation to review patient care to ensure that it meets minimum professional standards.

99. Federal QIOs adjudicate patient disputes regarding early discharges when notice has been given by the hospital, they perform utilization reviews and they perform reviews of patient complaints about poor quality of care.

100.    The Virginia QIO is a federal contractor under contract with CMS to perform specific statutory and regulatory responsibilities, to include the review of patient complaints of substandard quality of care pursuant to 42 USC §1320c-3.

101.    If a QIO finds that the care provided did not meet minimum professional standards, it must, after having provided notice and opportunity, submit to Health and Human Services (HHS) Office of Inspector General (OIG) a report recommending sanctions if a provider, "Grossly and flagrantly violated any obligation in one or more instances." 42 CFR 1004.30.

102.    A "gross and flagrant" violation is defined as: "Gross and flagrant violation means a violation of an obligation has occurred in one or more instances which presents an imminent danger to the health, safety, or well-being of a program patient or places the program patient unnecessarily in high-risk situations." 42 CFR 1004.1.

103.    42 CFR 1004.1 defines obligation as, "any of the obligations specified at Section 1156(a) of the Act." Section 1156(a) of the Social Security Act imposes the obligation on health care providers to provide care that meets minimum professional standards. This would include as well the Conditions of Participation.

104.    42 CFR 1004.4 provides that when a QIO identifies a violation of an obligation, it must—
(a) Indicate whether the violation is a gross and flagrant violation or is a substantial violation in a substantial number of cases; and
(b) Send the practitioner or other person written notice of the identification of a violation containing the following information—
(1) The obligation(s) involved;
(2) The situation, circumstances or activity that resulted in a violation;
(3) The authority and responsibility of the QIO to report violations of any obligation under Section 1156(a) of the Act;
(4) A suggested method for correcting the situation and a time period for corrective action, if appropriate;
(5) The sanction that the QIO could recommend to the OIG;

28

(6) The right of the practitioner or other person to submit to the QIO within 30 days of receipt of the notice additional information or a written request for a meeting with the QIO to review and discuss the finding, or both. …

105.    A QIO's exercise of its delegated authority, under contract, is guided by the QIO Manuals, found at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019035.html?DLPage=2&DLSort=0&DLSortDir=ascending. Generally the process entails: (i) reviewing the complaint; (ii) reviewing the medical record; (iii) sending a notice to the provider as to the QIO's findings, including whether there is a violation of Medicare regulations (failure to meet minimum professional standards); (iv) informing if a violation is a gross and flagrant violation; (v) providing an opportunity for explanation, if appropriate; (vi) revising the findings, if appropriate; and (vii) sending the final decision to the beneficiary, which closes the case. QIO decisions are unappealable.

106.    Not written in the QIO Manual is a practice employed by the QIO's in multiple states of considering only evidence provided in the beneficiary's medical record for the provider about whom a complaint is made. Multiple QIOs have a stated in writing a policy of refusing factual evidence from anyone outside of the provider.

107.    If a violation is found that is not a gross and flagrant violation, the QIO may require the provider to propose and implement a Corrective Action Plan. According to the regulations and the Medicare QIO manual, Corrective Action Plans occur prior to a final beneficiary letter, which has the effect of closing the case.

108.    If there is a gross and flagrant violation, the QIO may not request a corrective action plan as sanctions are mandatory. QIO Manual, Section 4710.

109.    Exclusion of a provider is a permitted sanction that may be recommended. Federal law permits exclusion from the Medicare program for any provider that fails to provide care that meets minimum professional standards. 42 USC 1320a-7(b)(6).

110.    A QIO may recommend monetary sanctions.

111.    A QIO may recommend non-payment for services that do not meet minimum professional standards.

112.    QIO recommendations for sanctions are sent, with a prescribed analysis, to the Inspector General of the Department of Health and Human Services. If the Inspector General's Office does not disagree with certain sanctions, the QIO's sanction recommendations are automatically implemented.

113.    In a 2007 HHS/OIG Report, "Quality Concerns Identified Through Quality Improvement Organization Medical Record Reviews", QIO's were found not to recommend any changes in 38% of cases where a quality of care violation was documented. Despite the low threshold for the definition of "gross and flagrant," QIOs recommended sanctions in only 2% of cases.

114.    The Executive Vice President of the American Health Quality Association (the trade association for QIOs) defended QIOs by claiming that when substandard care is discovered, the Centers for Medicare & Medicaid Services instructs quality organizations to push for correction of missteps by physicians and hospitals using the "least intrusive" methods (rather than by complying with fairly strict regulatory requirements). "Consistent with these instructions, QIOs used the least intrusive actions in 70% of the more than 4,600 cases where providers were asked to make changes to improve quality," he said. "The agency's instructions

in this regard represent a judicious exercise of the government's power." ("HHS: Medicare

Quality Groups Go Easy on Low Performers," American Medical News, July 9, 2007).

115.     A condition of Medicare paying provider claims is that the care provided is
medically necessary:

> "(a) Notwithstanding any other provision of this title, no payment may be made under part A
> or part B for any expenses incurred for items or services—
> (1)(A) which, except for items and services described in a succeeding subparagraph, are not
> reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the
> functioning of a malformed body member,"

116.     Medicare defines medically necessary as: "Health care services or supplies

needed to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms and

that meet accepted standards of medicine". http://www.medicare.gov/glossary/m.html. Emphasis

added.

117.     If a beneficiary has original Medicare coverage, if Medicare allows a claim,

Medicare pays 80% and the beneficiary is obligated to pay 20% of the Medicare allowed claim

to the care provider.

118.     If Medicare disallows a claim as not medically necessary, the beneficiary is not

obligated to pay the provider and the provider may not seek payment from the beneficiary unless

the provider gave the beneficiary a prescribed advanced warning of likely Medicare non-

coverage.

119.     Accordingly, if a QIO finds that care did not meet minimum professional

standards, the care is not properly payable by Medicare, and the beneficiary also has no

obligation to pay.

## V. A. QUALITY OF CARE CONCERNS BY SHARON VAN PUTTEN ABOUT
## INOVA
## - DELAY OF BACK SURGERY

120.     On June 27, 2011, Sharon Van Putten experienced severe pain in her back, shortness of breath and confusion while visiting daughters in Northern Virginia. She had had numerous back surgeries, including one in January 2011 to repair broken spinal fusion hardware in the thoracic region of the back.

121.     As a result, Sharon Van Putten's husband, Allen Van Putten and a daughter brought Sharon Van Putten to Inova Fair Oaks Hospital on June 27, 2011.

122.     Sharon Van Putten suffered from rheumatoid arthritis and had been on Social Security disability since 1999.

123.     Sharon Van Putten had preexisting conditions of a fused (left) wrist, which meant that she could not bend her wrist in any manner and missing tendons on her (right) hand, meaning that she could not open her hand. Sharon Van Putten also had torn shoulder ligaments, preventing full rotation and strength of the shoulder.

124.     The Emergency Room Physician Aamir Latif examined Sharon Van Putten. Although he documented a neurological exam, he did not in fact perform one. The results that he documented of a normal neurologic exam were impossible due to Sharon Van Putten's pre-existing wrist fusion and lack of extensor tendons as flexing wrists and opening hands are necessary to test the function of the spinal cord at certain levels. The torn shoulder ligaments prevented normal shoulder adduction and abduction, as is recorded in the records of health care providers.

125.     An X-ray and a Chest CT performed at Inova Fair Oaks showed that a rod used to stabilize Sharon Van Putten's spine during the most recent back surgery had broken, causing a compression of the spine into the spinal cord. The CT results reported a compression fracture in the mid-thoracic.

126.     Emergency Room Management subsequently confirmed to the Virginia DOH Investigators that the radiological images showed the rods in Sharon Van Putten's back as stopping and starting, which would have indicated a break in the rod, and resulting spinal instability. This was documented by the Virginia DOH Defendants.

127.     Sharon Van Putten was released to home, with no assessment by a neurologist or neurosurgeon, with a diagnosis of "thoracic back pain."

128.     Had Sharon Van Putten been evaluated by a competent neurosurgeon, emergency surgery to stabilize the spine would have been recommended.

129.     The Chest CT also showed a "nodule" in Sharon Van Putten's lung.

130.     Sharon and Allen Van Putten were told that this nodule was an incidental finding.

131.     By June 30, 2011, Sharon Van Putten had declined substantially.

   a.     She was having increased difficulty breathing

   b.     She had worsened pain in the back with electrical shooting pain down the legs

   c.     She was frankly hallucinating.

   d.     She was having difficulty walking

132.     Allen Van Putten, Sharon Van Putten and their daughter returned to the Emergency Room at Inova Fair Oaks where the above symptoms were noted in Sharon Van Putten's medical record by Emergency Room staff.

133.     Sharon Van Putten was discharged to home by Emergency Room Dr. Gregory Wagner despite protests by Allen Van Putten that Sharon Van Putten was gravely ill.

134.     Several hours after discharging Sharon Van Putten, Dr. Gregory Wagner attempted to document that she had left "against medical advice" even though the only advice recorded in the notes was that Sharon Van Putten should go home.

33

135.    This after-the-fact documentation did not meet the requirements of EMTALA because Dr. Wagner did not document the additional screening and treatment offered.

136.    In fact, Dr. Wagner documented that he offered no additional screening or treatment.

137.    About midnight on July 1, 2011, Sharon Van Putten became extremely distressed.

138.    She was brought by ambulance to a local freestanding emergency room, at which she was observed to have weakness in the legs to the point that she could not lift them.

139.    In the early hours of July 1, 2011, Dr. Kevin Mahaney of Inova Fairfax Hospital agreed to accept the transfer of Sharon Van Putten for emergency evaluation of a potential spinal cord lesion causing the paraplegia and represented to the emergency room doctor at the freestanding facility that Fairfax had the capability to handle the evaluation.

140.    Inova Fairfax Hospital is certified as a Level One Trauma Center. Virginia defines a Level One Trauma Center as having, "an organized trauma response and are required to provide total care for every aspect of injury, from prevention through rehabilitation. These facilities must have adequate depth of resources and personnel with the capability of providing leadership, education, research and system planning."

141.    Inova Fair Oaks' records indicate that Sharon Van Putten's medical records were edited by Dr. Gregory Wagner around 3:00 am on July 1, 2011, at the same time which Sharon Van Putten arrived by ambulance to Inova Fairfax Hospital. This represents a 14-hour delay in finalizing Sharon Van Putten's medical records, quite obviously well after Dr. Wagner's shift would have ended.

142.     Upon Sharon Van Putten's arrival on July 1, 2011 at Inova Fairfax Hospital, a college student member of the Inova staff reviewed the imaging report from June 27, 2011 at Inova Fair Oaks Hospital and erroneously reported it as normal.

143.     Inova Fairfax Hospital staff noted in the medical record that the Sharon Van Putten had been discharged (not "left AMA") from Inova Fair Oaks the day before for the same condition resulting in her arrival at Inova Fairfax.

144.     Upon arrival at Inova Fairfax, Sharon Van Putten had full sensation in her legs and was able to move her ankles, but could not move her legs.

145.     Despite the promise of an emergency neurologic evaluation and despite the very concerning loss of movement of the legs after several days of document thoracic back pain, an X-ray showing broken spinal rods and a CT recording a 'compression fracture" of the spine, Inova Fairfax did not have a neurologist or neurosurgeon evaluate Sharon Van Putten until nearly 12 hours after she arrived at Inova Fairfax.

146.     There was no order to stabilize her spine during this time and she was repeatedly transferred from surface to surface using a bed sheet, not a backboard, which put pressure on the area of the spine where the compression fracture was, further increasing the risk of injury.

147.     No doctor ordered her admitted to Inova Fairfax until 12:30 pm on July 1, 2011, about ten hours after her arrival.

148.     By the time a neurosurgeon was requested, Sharon Van Putten had lost all sensation from the bra-line down, indicating a serious progression of the injury.

149.     Notwithstanding this alarming change, neuroradiologists refused to perform the emergency orders issued by the neurosurgeon that were a pre-requisite for surgery. Instead, the neuroradiology staff demanded multiple unnecessary, useless tests with high reimbursement

rates. Then they left for the evening on a holiday weekend with the orders for the necessary test unfulfilled.

150.     At about 11:30 pm on the evening of July 1, 2011, the neurosurgeon finally informed Allen Van Putten that Inova Fairfax Hospital lacked the personnel available to assess Sharon Van Putten. Rather than transfer her to another hospital with available personnel, the neurosurgeon chose to tell Allen Van Putten to go home and that his wife would likely die.

151.     Sharon Van Putten's daughter, Debra Van Putten, upon hearing this news, called the hospital and demanded to speak with the person in charge. She was transferred to Nurse Kate Roman, to whom she explained the lack of available care.

152.     Debra Van Putten also found the home phone number for the CEO of the Inova Hospital System, Mark Stauder. She called him not long after midnight and he promised to get medical personnel available immediately. At 1:11 am on July 2, 2011, Debra Van Putten received a call from Inova stating that staff had been recalled.

153.     A CT myelogram the test that the neurosurgeon viewed necessary for proceeding to surgery, consists of injecting dye into the space around the spinal cord, rotating the patient to mix the dye in with the spinal fluid, and then imaging.

      a.   Due to the extreme amount of untreated pain which Sharon Van Putten was in already, neuroradiology insisted that an anesthesiologist was necessary to perform the CT myelogram, however, Inova Fairfax reported that they had no anesthesiologists available for emergency treatment.

      b.   Notwithstanding, no anesthesiologist was present when Dr. Philip Minshew returned to perform the myelogram at about 4:30 am on July 2, 2011. Rather than sedation methods available with an anesthesiologist, which would have allowed for

sedation to be stopped in an emergency, Sharon Van Putten was sedated by the use of large doses of oral narcotics and anti-anxiety medication, combined with additional large doses of narcotics and anti-anxiety medication injected into her IV.

c.   The combination was high enough that there was concern that she would stop breathing or that her heart would stop. A nurse was present to watch the heart rate and oxygen saturation using rudimentary equipment, but no medication was ordered to be present to undo the effects of the narcotics.

154.     A report assessing the imaging was not available until about 8:30 am. Although the break in the hardware was clearly evident to a layperson, the report stated "hardware intact".

155.     Although surgery was performed, it did not result in any restoration of function, largely due to the extreme delay in treatment.

156.     Upon information and belief, had Sharon Van Putten received prompt surgery to relieve the pressure on her spinal cord on June 27, 2011 and on June 30, 2011, she would have fully regained function.

157.     Upon information and belief, had Sharon Van Putten received prompt evaluation and treatment upon arrival to Inova Fairfax on July 1, 2011, she would have regained partial use of her legs, to include the ability to transfer herself and possibly to walk with the assistance of a walker. She also would have retained bowel and bladder function.

158.     Instead, due to the delay in treatment, Sharon Van Putten became a paraplegic from the bra-line down, with loss of abdominal muscle functions, to include the ability to sit and accessory muscles for breathing.

159.    In a decision rendered on February 19, 2013, Medicare found that Inova's care failed to meet minimum professional standards in that there was an excessive delay in proceeding to surgery.

### V.B.  STEROID OVERDOSE, 1ST PRESSURE ULCER, STEROID PSYCHOSIS, ILLEGAL DRUGGING, ILLEGAL RESTRAINTS, HOSPITAL-ACQUIRED INFECTION, HOSPITAL-CAUSED CARDIAC ARREST, FAILURE TO ALLOW PATIENT PARTICIPATION IN CARE AND FAILURE TO PROVIDE CHOICE IN DOCTORS

160.    When Sharon Van Putten was first seen by neurosurgery, the neurosurgeon ordered a large "shock" dose of steroids pre-surgery to reduce swelling in the area of the compression of the spine until surgery could be performed.  He ordered that dose of steroids be discontinued on July 2, 2011.

161.    The steroid dose, 16 mg of dexamethasone per day, exceeded the FDA limit (9 mg per day, with 0.75 mg per day being a typical dose) substantially. The FDA-listed side effects of steroids include steroid psychosis ("Psychic derangements may appear when corticosteroids are used, ranging from euphoria, insomnia, mood swings, personality changes, and severe depression, to frank psychotic manifestations"), increased susceptibility to infections ("with increasing doses of corticosteroids, the rate of occurrence of infectious complications increases. Corticosteroids may also mask some signs of current infection"), impaired wound healing, thin skin, and cardiac arrest.

162.    Despite the order discontinuing the steroids and the lack of any medical necessity for the medication, Inova Fairfax continued to administer the drug for the period of a week and a half. During this time frame, Sharon Van Putten suffered cardiac arrest, developed a stage III pressure ulcer to the sacrum, developed a life-threatening systemic infection resulting in respiratory failure, and developed frank psychosis marked by horrific hallucinations, to include

seeing dead babies coming out of the walls and believing that her brain had been removed from her head and was lying on the floor and being stepped on.

163.    Sharon Van Putten had no previous history of any delusional mental disorder, except for one previous incident of steroid psychosis about 15 years previous.

164.    While these disturbing hallucinations were occurring, the family is recorded in Sharon Van Putten's medical records as urgently and persistently asking Inova's medical staff to consider the possibility of a drug reaction, and specifically raised concerns about the steroid dosing. Dr. Jason Williams documents not only these family concerns but that the family was very upset that they are not being allowed to participate in the plan of care (Sharon Van Putten was not competent at the time due to the overdose). The family also met with Inova Fairfax to request a list of the medications that Sharon Van Putten was receiving, which request was refused as being impossible to provide.

165.    In response to the severe steroid psychosis, and instead of reducing the steroid dose as required by the order discontinuing the drug, Inova Fairfax staff, to include doctors Eugene Kim and resident Jason Williams, chose to administer anti-psychotics and to physically restrain Sharon Van Putten. In addition, they discontinued her normal anti-anxiety medication and anti-depressants, actions likely to increase agitation.

166.    Sharon Van Putten and the Van Puttens repeatedly refused the anti-psychotics, to include written notations in the record and a large notice placed on the outside of the medical chart. The family repeatedly raised concerns that the anti-psychotics were causing swallowing problems (a listed side effect), which could be fatal to a patient who lacked abdominal muscles and therefore had little capacity to cough. Sharon Van Putten was contemporaneously diagnosed

with aspiration pneumonia and required suctioning of her lungs while in the operating room for a diagnostic procedure.

167.    Notwithstanding these refusals of anti-psychotics and the family's stated concerns about medication interactions, Inova Fairfax continued to administer both the antipsychotics and the steroid overdose. Both were discontinued only after a Van Putten family member forced a nurse to disclose what medications were being administered and Inova then admitted its error.

168.    Jason Williams continued to order anti-psychotics after he was fired from Sharon Van Putten's care, due to incompetence in failing to identify the steroid overdose.

169.    Although the Van Putten family had fired Dr. Eugene Kim from Sharon Van Putten's care due to the steroid overdose, he was later reassigned to her.

170.    Soon after the refused medications were stopped, Sharon Van Putten improved and was discharged to a rehabilitation facility. At the time of discharge, Sharon Van Putten had a large, deep wound on her sacrum, a 5-inch gash on her arm caused by Inova, but was on room air and was eating/swallowing.

171.    Initial discharge to the rehabilitation facility was scheduled for July 7, 2011, Due to Inova's myriad errors, the discharge was not done until July 21, 2011.

172.    The restraints precluded Sharon Van Putten from being repositioned regularly as is required for a paralyzed person to not suffer a pressure ulcer. Even once the restraints were removed, Inova staff did not reposition Sharon Van Putten as required. She was also not placed on a pressure reducing mattress, as is required.

173.    The Virginia QIO found that Inova's care with respect to causing the pressure ulcer not to have met minimum professional standards.

### V.C. SECOND MISSED OPPORTUNITY TO ADDRESS LUNG CANCER AND FAILURE TO DISCLOSE

174.     While Sharon Van Putten was in respiratory failure during her first hospitalization, Inova performed a second Chest CT on July 10, 2011.  That CT showed that the nodule shown on the June 27, 2011 Chest CT had grown, a finding inconsistent with the anomaly being six months old scar tissue.

175.     Upon information and belief, the rate of growth of the nodule and the size of the nodule indicated that it was very likely to be lung cancer.

176.     Notwithstanding this risk of lung cancer, Inova Fairfax did nothing to evaluate Sharon Van Putten as to whether she had lung cancer.

177.     Neither Sharon Van Putten (who was not competent) nor her family was told that the CT showed that the nodule had grown.

178.     Upon information and belief, if the nodule had been evaluated and diagnosed during this hospitalization as lung cancer, the stage of the cancer was early enough that she could have had surgery, with a 60% likelihood of survival at 5 years.

179.     Inova doctor Eugene Kim, previously terminated from Sharon Van Putten's care, prepared the discharge summary sent to the acute rehabilitation hospital about her medical condition. Dr. Kim failed to tell the rehabilitation hospital to which Sharon Van Putten transferred that Sharon Van Putten had a lung nodule. In a report dated February 19, 2013, the Virginia QIO found that with respect to this omission, Inova Fairfax failed to meet minimum professional standards.

180.     The standard for admission to the rehabilitation hospital is the capacity to undertake three hours a day of hard physical rehabilitation.

181.     While at the rehabilitation facility, Sharon Van Putten's respiratory status declined and she began to require oxygen. Not knowing about the likelihood of lung cancer, the rehabilitation hospital attributed the need for oxygen to the intensity of her rehabilitation.

182.     The severe pressure ulcer at her sacrum limited Sharon Van Putten's ability to complete a full course of rehabilitation, and so she was discharged to a skilled nursing facility, Fairfax Nursing Center, for treatment and healing of the pressure ulcer, with the intent for her to return to her home in Naples, FL for further rehabilitation services. At that time, the pressure ulcer was too severe to allow for travel other than by air ambulance and it was hoped that with further treatment Sharon Van Putten would be able to tolerate less costly transportation.

183.     In order to facilitate the anticipated transfer to home in Naples, Florida, and unaware that his wife had a limited lifespan due to untreated and undisclosed cancer, Allen Van Putten purchased a mobility van, a complex rehabilitation wheelchair, and a power lift. The total cost for these purchases was $66,600 and none have been reimbursed by Medicare.

## V.D.  THIRD MISSED OPPORTUNITY TO ADDRESS LUNG CANCER AND FAILURE TO DISCLOSE

184.     On August 17, 2011, while at Fairfax Nursing Center, Sharon Van Putten went into respiratory distress. She was brought by ambulance to Inova Fairfax Hospital and yet again assigned to the care of Dr. Eugene Kim.

185.     During this hospitalization, Sharon Van Putten was left on a hard mattress again, causing the pressure ulcer to substantially worsen.

186.     During this hospitalization, Sharon Van Putten underwent several CTs, one of which showed the lung mass as growing, with adenopathy. These findings were described by the radiologist as "urgent" and clearly indicated a high likelihood of cancer.

187.     When Allen Van Putten protested the assignment of Dr. Eugene Kim to Sharon Van Putten's care, Sharon Van Putten was summarily discharged from Inova Fairfax back to the skilled nursing facility, Fairfax Nursing Center, on August 18, 2011.

188.     Inova Fairfax failed to inform the skilled nursing facility that Sharon Van Putten had a growing lung nodule requiring "urgent follow up."

189.     Upon arrival at Fairfax Nursing, the doctor there ordered an immediate surgical debridement of Sharon Van Putten's sacral pressure ulcer due to necrotic tissue. This despite the documentation the previous day by nurse Patricia McCray that the pressure ulcer was minor.

190.     From August 18, 2011 through August 29, 2011, while at Fairfax Nursing Center Sharon Van Putten became increasingly weak, short of breath and had a substantial loss of appetite.

191.     As a result of the extremely poor care on previous hospitalizations, Allen Van Putten ordered Fairfax Nursing not to send Sharon Van Putten to any Inova facility in the event of an emergency.

### V.E. THIRD INOVA FAIRFAX VISIT—STARVATION, ILLEGAL RESTRAINTS, INVOLUNTARY DRUGGING, NEVER EVENT INFECTION, REFUSAL TO TRANSFER AND DELIBERATE DISREGARD OF CANCER

192.     In the early morning hours of August 29, 2011, Sharon Van Putten had problems breathing.

193.     Fairfax Nursing Center called an ambulance and called Allen Van Putten.

194.     Allen Van Putten called 911 and spoke with Fairfax County dispatch to request diversion of the ambulance to a non-Inova facility. Fairfax County dispatch refused the request.

195.     Allen Van Putten and his/Sharon's two daughters arrived at Inova Fairfax's ER.
Sharon Van Putten expressed her extreme displeasure at being at an Inova facility and requested
that the family arrange a transfer elsewhere.

196.     The family asked the ER attending to arrange for a transfer to another hospital on
the grounds that Inova's poor care had resulted in severe injury and risk of death and expressing
grave concerns that another round of Inova's mistreatment would result in death. The ER
attending refused and documented his refusal in the medical record, along with the Van Puttens'
adamant concerns.

197.     The family called the CEO of the hospital system, Mark Stauder. He also refused
to arrange a transfer.

198.     The family requested the presence of a doctor not in the employ of Inova to assess
Sharon Van Putten.

199.     Dr. Robert Bloom, a board-certified pulmononologist, arrived.  He immediately
recommended that Sharon Van Putten receive no treatment as she was "end-stage COPD"
without so much as an examination.

200.     Family disputed his assessment and then Dr. Bloom reviewed Sharon Van
Putten's medical records for about 45 minutes. Thereafter, Dr. Bloom opined that Sharon Van
Putten had an infection. She was transferred to the Medical Surgical ICU with Dr. Bloom as the
attending.  Dr. Bloom refused family requests for an infectious disease consult.

201.      Dr. Bloom, without the knowledge of the family, ordered Sharon Van Putten to
receive no nutrition from any source.

202.     This order depriving Sharon Van Putten of nutrition was continued from the early
morning hours of August 29, 2011 through September 3, 2011 (6.5 days).

44

203.     At the same time, Dr. Bloom refused to order Sharon Van Putten's regular COPD medications.

204.     Inova nursing staff duly recorded, on an hourly basis, this deprivation of all nutrition/caloric intake, from August 29, 2011 through mid-day September 3, 2011.

205.     Inova records indicate that Sharon Van Putten reported that she had little to no food, due to poor appetite, for a few days before August 29, 2011.

206.     On September 3, 2011, Sharon Van Putten was ordered to have tube feedings, but due to the malfunction of the pump for the liquid, she received only about 370 calories between September 3-4, 2011.

207.     As a result of this gross deprivation of all caloric intake, Sharon Van Putten suffered a heart attack. That this heart attack was caused by mineral imbalances resulting from the absence of nutrition is documented in Inova Fairfax's records by a partner of Dr. Bloom.

208.     Dr. Christine Bussey, a cardiologist, assessed Sharon Van Putten during this period of time, but did not order nutrition.

209.     Drs. Libre, Lamberti, Granada and Gowdi also treated Sharon Van Putten during the deprivation of nutrition and did not order the administration of nutrition.

210.     The statement from Dr. Bloom explaining why Sharon Van Putten was deprived of nutrition, as reported by the Virginia Office of Licensure and Certification is as follows: "She.. was very sick. She was paralyzed from the ribs down. She was too weak to cough. She did not have pneumonia but her spine was not fixable. I recommended that she… be placed on comfort care."

211.     "Comfort care" is a term used for terminally ill patients who are not provided with medical treatment, but only are made comfortable. A doctor may not order comfort care without

authorization of the patient, the patient's family, or an advance directive and there must be a diagnosis of a terminal illness. Comfort care includes providing nutrition and hydration. The diagnosis listed for admission at the time of the order – a simple urinary tract infection -- is not, without some other complicating factor, considered to be a terminal illness.

212.     Sharon Van Putten did not have an advance directive authorizing the hospital to deprive her of nutrition.

213.     None of Sharon Van Putten's family authorized withholding nutrition and was distraught when told by Inova that it had starved Sharon Van Putten.

214.     Sharon Van Putten did not authorize being starved and was very distraught at this having been done to her.

215.     A specific example which the QIO manual gives as an Immediate Jeopardy is deprivation of nutrition without an advance directive.

216.     While Sharon Van Putten was being starved, her pressure ulcer, which had healed to the point of having a thin layer of skin, became wide open. A high level of protein in the diet is necessary to maintain skin integrity for a pressure ulcer.

217.     She was at this time, again given steroids that were not tapered as directed and then restrained and therefore not regularly turned to prevent pressure ulcers. She was also deprived of access to a call button. At times the large, gaping wound was left without any dressing and it was in close proximity to the anus. Nursing staff did not regularly check to see if Sharon Van Putten had defecated and it required persistent efforts of the family to obtain a change of bedding when the room began to have an aroma of feces. Multiple attempts to meet with hospital administration, including Kate Roman, to discuss the poor level of care fell on deaf

ears. Eventually, the wound care nurse, Patricia McCray, described the wound as having green and yellow discharge. Even then, there was no effort to provide better or more aggressive care.

218.     The Van Puttens renewed their efforts to have Sharon Van Putten transferred to a different hospital, requesting transfer to the hospital near her home where her regular doctors were. A key consideration was ensuring that Sharon Van Putten would never be treated at an Inova facility. Inova stonewalled and instead began processes to return Sharon Van Putten to Fairfax Nursing Center.

219.     The Van Puttens were not able to remove her from Inova on their own because Sharon Van Putten required equipment for which a doctor's order was necessary and she had no existing doctors in the Washington, D.C. area that could provide care on an outpatient basis or order skilled nursing at one of her daughters' homes. In addition, both homes were not accessible for a person with as profound an injury as hers. Her home in Florida, however was handicap-accessible.

220.     Sharon Van Putten remained in restraints, nearly continuously from August 30, 2011 until September 11, 2011. Most of the time, in fact, she was in dual restraints – wrists strapped to the bed rails and hands strapped inside oversized mitts. She remained restrained while sleeping and while deprived of her usual anxiety medication and with pain medication being routinely late, typically 1-2 hours. When nurses documented Sharon Van Putten in pain or anxious, they did not call a doctor, but rather chose to leave the patient restrained. She is recorded in the nursing notes as very upset about her involuntary detention and crying "Freedom" and "Help."

221.     The Van Putten family has been unable to obtain an accounting of the more than 100 mg of Dilaudid that were recorded as having been administered in Inova's pharmacy

records, but in fact were not. Inova's own records indicate the Van Putten family was viewed by
the nursing staff as unreasonable due to their requests that pain and anxiety medication be
administered on time and in accordance with doctors' orders. Nursing records do not comport
with DEA requirements, to include recording the time of actual administration of a narcotic
hours before that time and not recording the administration of a narcotic up 16 hours after the
actual administration, greatly increasing the risk of an overdose.

222.    Restraint orders were issued by whatever doctor was handy, and there was no
modification of the patient's treatment plan, as required by Medicare regulations.

223.    While Sharon Van Putten was restrained, nursing staff demanded that the family
provide 24/7 coverage to preclude the patient from pulling out the naso-gastric tube. While the
family was present, the naso-gastric tube was not removed. When the family was not present,
the restraints were insufficient to preclude Sharon Van Putten, who was wishing to flee the
facility, from pulling all tubes.

224.    In fact, the restraints provided a leverage point by which Sharon Van Putten could
drag herself across the bed, causing damage to the area of the pressure ulcer.

225.    Inova refused to provide a sitter, despite requests from the family, during a
meeting with Inova Social Work and Patient Relations at a meeting on September 6, 2011.

226.    When the restraints were finally removed at the insistence of the family, Sharon
Van Putten's hands were foul smelling with a fungal infection and her hands had contractures
from lack of movement from such an extended period of time.

227.    After having learned of the starvation, witnessing the worsening pressure ulcer
and seeing the refusal of Inova to arrange for an appropriate discharge, Debra Van Putten called

Fairfax County Adult Protective Services as she believed that Inova's poor care would kill Sharon Van Putten.

228.    The Fairfax County Adult Protective Services intake person refused to take a complaint against Inova Fairfax Hospital, on the grounds that she was a social worker employed at Inova Fair Oaks and "Inova wouldn't do that."

229.    During this time frame, Inova informed the family that Sharon Van Putten had contracted a catheter associated urinary tract infection caused by a "superbug" at the hospital called "multi-drug resistant Klebsiella."

230.    Upon information and belief, this pathogen has a 50-70% mortality rate.

231.    Medicare has deemed hospital acquired catheter associated urinary tract infections as events that should never occur in a hospital and therefore are not reimburseable.

232.    While Sharon Van Putten was infected with this deadly pathogen, the family witnessed hospital staff moving furniture and equipment amongst patients' rooms without regard to whether the patient was in isolation.

233.    Upon information and belief, when NIH had one patient with this pathogen, it spread and resulted in seven total deaths, even with such aggressive measures as NIH ripping out the plumbing in affected rooms.

234.    On September 11, 2011, Sharon Van Putten had a fourth Chest CT at an Inova facility, which showed a growing mass in her lung along with pleural effusions.

235.    This CT, her persistently cycling white count, and increasingly poor respiration resulted in a flurry of medical notes surmising that the "nodule" found on the June 27, 2011 CT was in fact likely lung cancer, with multiple requests for thoracentesis, a PET scan, and biopsies

to evaluate whether Sharon Van Putten had lung cancer. These notes covered the time span of September 11, 2011 through September 17, 2011.

236.    The family was not advised that Inova Fairfax had concerns that Sharon had cancer.

237.    During this time frame, Sharon Van Putten descended into an uncommunicative catatonic state which Inova doctors attributed to extreme PTSD resulting from her mistreatment at Inova.

238.    Completely stymied by the hospital's refusal to transfer Sharon Van Putten and its grossly deficient care, Debra Van Putten attempted to contact Medicare.

239.    Attempts to obtain assistance by means of the '1-800-Medicare hotline' number proved futile and so on September 12, 2011, Debra Van Putten emailed Janice Hoffman, the General Counsel of Medicare, to request appropriate routing of Sharon Van Putten's concerns, to include:

   a.  She had been dumped multiple times from Inova with untreated medical problems

   b.  She had been overdosed on steroids and had been illegally restrained

   c.  She had been given antipsychotics despite a refusal of that class of medication

   d.  Poor infectious disease control resulting in multi-drug resistant Klebsiella

   e.  Starvation for a week

   f.  Failure to provide adequate nursing staff and having family members perform nursing functions

   g.  Demands for medically unnecessary treatment (a tracheostomy) as a condition of care with the threat of sending Sharon Van Putten to hospice care to die if this

treatment was not accepted. Robert Bloom is the doctor who engaged in this
blackmail attempt in furtherance of Medicare fraud.

h.  Inova claiming that it didn't have any more doctors other than frequently fired
Dr. Eugene Kim who could treat Sharon Van Putten.

i.  Severe pressure ulcer.

240.    Ms. Hoffman responded, indicating that the complaint was being forwarded to
CMS's Philadelphia Regional Office and the relevant QIO.

241.    Per CMS documents, Ms. Carissa Sanchez was the lead investigator for the
Philadelphia Regional office, and sent the entire complaint to the Virginia Department of Health
on September 14, 2011. That referral bore the designation of "Immediate Jeopardy."

242.    On September 15, 2011, the only people from Medicare who had contacted the
Van Puttens were from the "National Beneficiary and Family Coordination Center QIO"
(National QIO) in Tampa, Florida and they indicated that they could do nothing to help the Van
Puttens. Inova had completely stalled all attempts for transfer.

243.    Accordingly, Debra Van Putten called the Inova social worker for Sharon Van
Patten and expressed her extreme concern that Sharon Van Putten was being criminally abused
and requested a meeting with Inova's Counsel to seek a resolution of this matter. During this
conversation, Inova Fairfax Social Worker Mary Stringer agreed that if a patient were admitted
in the same physical condition and with the same history as Sharon Van Putten, but instead had
been in the care and custody of the family, Inova would call Fairfax County Adult Protective
Services with allegations of elder abuse and neglect.

244.      Instead of arranging a meeting with Inova Counsel, Ms. Stringer arranged for a meeting with Patrick Christiansen, COO of Inova Fairfax Hosptital, and Kate Roman, Head Administrative Nurse.

245.      During that meeting, held on September 17, 2011, the Van Puttens discussed their extreme concern for Sharon Van Putten who was being detained by Inova, given its refusal to make other arrangements for her medical care. Kate Roman admitted that Sharon Van Putten's physical condition and treatment had all the indicia of criminal abuse and neglect. Patrick Christiansen concurred that he could understand why the Van Puttens did not consider Inova Fairfax to be a safe hospital.

246.      It was also discussed that the Van Puttens were not even able to arrange for an air ambulance to remove Sharon from Northern Virginia and into the care of her regular physicians in Naples, Florida because of Inova's intransigent conduct.

247.      Patrick Christiansen agreed that Inova would pay for an air ambulance but told the Van Puttens they were responsible for arranging a transfer and admission to a different facility, contrary to Inova's responsibilities under Medicare's Conditions of Participation. Patrick Christiansen stated to the family, "Good luck finding a facility which will take her."

248.      Staff for Naples Community Hospital, the preferred facility, informed the Van Puttens that the family could not arrange a transfer – that Inova Hospital staff were necessary and obligated to manage this task under existing regulations.

249.      As follow-up to the meeting with Mr. Christiansen, Debra Van Putten emailed Inova Fairfax COO Patrick Christiansen.  He stated that he had investigated Sharon Van Putten's treatment and stated that she was getting "great care."

52

250.     In order to facilitate the transfer, Inova was required to send to potential receiving facilities Sharon Van Putten's current medical records.

251.     In order to be accepted by a transferee hospital, one must have an "acute" level medical condition.

252.     If one is a Medicare patient and one transfers from one hospital to a second hospital, Medicare regulations require that the two hospitals share what is called a "DRG," which is a flat fee based on the patient's diagnosis, which fee is unrelated to the actual costs incurred by the hospitals to provide treatment.

253.     Unbeknownst to the Van Puttens, Inova misrepresented to the other potential receiving hospitals that Sharon Van Putten had only minor, if any, medical issues. Patient progress notes documenting her medical condition were redacted to omit any reference to the growing lung cancer that required urgent assessment and diagnosis.

254.     Furthermore, the diagnosis provided to Naples Community Hospital was a minor one, and Sharon Van Putten's by-then long and expensive hospitalization meant that any receiving facility would receive no reimbursement because of the DRG rules.

255.     Sharon Van Putten was denied admittance at Naples Community Hospital, in Naples, Florida, where all of her regular doctors practiced, because Inova had represented she had no acute medical condition and Inova had already "overspent" its DRG.

256.     The Van Puttens were in regular contact with the National QIO and the National QIO was unable and/or unwilling to intervene.

257.     The Van Puttens contacted, many times, the sole other advertised means of contacting Medicare, the 1-800-Medicare hotline and were told many times that Medicare would do nothing.

a.  The Medicare hotline indicated that there was no means of appealing this decision.

b.  The Medicare hotline refused to require Inova/Naples to disclose their communications.

c.  The Medicare hotline represented that its phone back personnel had only scripts for answering phone calls and had no means to provide information or obtain assistance that deviated from pre-existing scripts.

d.  In one phone call, the 1-800 operator recommended that the Van Puttens roll Sharon Van Putten out of the hospital in her hospital bed and then bring her to another hospital's ER as a means of resolving Inova's refusal to make good faith efforts in arranging a transfer. Upon information and belief, the specialized bed Sharon Van Putten was on cost $50,000 and stealing the bed would have likely resulted in felony charges. Sharon Van Putten was also oxygen-dependent at the time and hooked up to IV antibiotics. The 1-800 operator had no suggestions as to how to proceed once the bed had been rolled out of the hospital. Under Fairfax County's EMS protocol, whereby a patient may not refuse the EMS' choice of hospital, Sharon Van Putten would have ended up right back at Inova Fairfax.

258.    The Medicare hotline and the National QIO refused to take any steps to contact any person in Medicare with authority to resolve the apparent financial problems with a transfer and they refused to provide a phone number for the persons with statutory authority to resolve fiscal payment issues (the 'Fiscal Intermediary").

259.    Calls to Medicare personnel, up to and including HHS Secretary Sebellius' office resulted in the same refusals.

260.     When through other sources the Van Putten family found a phone number for the Fiscal Intermediary, fiscal intermediary staff informed the Van Puttens that the Fiscal Intermediary could not talk to beneficiaries or their families. All communication with the Fiscal Intermediary had to be routed through the hospital.  The Fiscal Intermediary informed the Van Puttens that they had no appeal rights as to hospital misconduct resulting in the denial of benefits unless the hospital issued a notice of denial of benefits, and that any complaint of hospital misconduct had to go through the hospital staff for the Fiscal Intermediary to address it.

261.      The Van Putten family was also unable to have Sharon Van Putten transferred to a lower level of care. In order for such a transfer to be arranged, Sharon Van Putten had to demonstrate the ability to perform physical therapy for at least 1 hour a day, as that is the Medicare requirement for being in such a facility.

262.     Inova Fairfax refused to provide physical therapy services (including the multiple times a day physical therapy necessary for paraplegics to prevent contractures) to enable a discharge to a lower level of care despite repeated and vociferous requests to senior nursing and medical staff.

263.     During this time, on September 19, 2011, the Virginia DOH Inspectors finally arrived to address the Van Puttens' complaints sent to Janice Hoffman.

264.     Medicare's inspectors are employees of the state of Virginia's Office of Survey and Licensure.

265.     Per Medicare records, Defendant Debbie Wintermantel and Defendant Mary Berryman were the assigned inspectors and Defendant Brenda Bagley was the assigned supervisor to handle the inspection of the Van Puttens' complaints.

266.     Upon information and belief, Defendants Wintermantel, Berryman and Bagley held nursing licensing in the state of Virginia.

267.     Under Virginia law, medical facility inspectors are mandated to report suspected abuse or neglect of an incapacitated person unless the inspector is performing a federal inspection of a nursing home. Va. Statute § 63.2-1606. This exception to mandatory reporting does not apply to a federal or state inspection of a hospital.

268.     Virginia defines abuse of an incapacitated adult as follows:

> "Abuse" means (i) knowing and willful conduct that causes physical injury or pain or (ii) knowing and willful use of physical restraint, including confinement, as punishment, for convenience or as a substitute for treatment, except where such conduct or physical restraint, including confinement, is a part of care or treatment and is in furtherance of the health and safety of the incapacitated person. Va Statute §18.2-369.

269.     Virginia defines neglect of an incapacitated adult as follows: "Neglect" means the knowing and willful failure by a responsible person to provide treatment, care, goods or services which results in injury to the health or endangers the safety of an incapacitated adult. Va Statute §18.2-369.

270.     Upon report of substantiated abuse or neglect of an incapacitated adult, Virginia Adult Protective Services – which in this case was Fairfax County Adult Protective Services -- has the authority to remove an incapacitated adult from a neglectful or abusive environment.

271.     Medicare reports and correspondence from Virginia represent that the Virginia Inspectors thoroughly reviewed Sharon Van Putten's medical records. Those medical records, at the time of the inspection, documented the following:

a.   Sharon Van Putten had a Stage III pressure ulcer of dimension 10 cm by 15 cm that was oozing green, foul drainage and which was not covered by any bandage,

adjacent to the anus. A Stage III pressure ulcer is a wound fully through all layers of skin and is a serious wound. A Stage III pressure ulcer is a red flag for neglect. Although the inspector was told that it was a Stage III, documentation at Inova indicated that it was a Stage IV pressure ulcer (Inova's records state that there was bone "protruding" from the wound and Dr. Shuman had evaluated the wound and documented it as a Stage IV). A Stage IV pressure ulcer has a 70% mortality rate within a year.

b.  Sharon Van Putten had a black eye severe enough to require a CT to rule out facial fractures.

c.  Medical staff believed that Sharon Van Putten likely had lung cancer, noting such in the medical records, but nothing was being done.

d.  Sharon Van Putten appeared "emaciated," "malnourished" and "unkempt."

e.  Sharon Van Putten had suffered multiple hospital acquired infections over the course of three hospitalizations.

f.  Sharon Van Putten had been subjected to a massive overdose of steroids, with about 40 doses, in amounts well exceeding FDA limits, having been administered after the medication had been ordered discontinued.

g.  Sharon Van Putten had been administered anti-psychotics in multiple events after written refusals had been logged in the medical record.

h.  Sharon Van Putten had been illegally restrained for the convenience of the hospital.

i.  Treatment for a spinal cord injury had been delayed due to the absence of any neuroradiologist for an entire night at a Level One Trauma center.

272.     A physical inspection of Sharon Van Putten would have revealed a deep gash on one arm and deep black bruising on the entire forearm region of both arms from restraints.

273.     The Virginia DOH Inspectors failed to make a complaint of abuse or neglect to Adult Protective Services, as required by Virginia law. As result, Sharon Van Putten was not removed from the abusive and neglectful care of Inova Fairfax Hospital.

274.     Debra Van Putten was interviewed by Debbie Wintermantel in the presence of an Inova nurse who was caring for Sharon Van Putten, who was catatonic due to PTSD. The Inova nurse confirmed that Sharon Van Putten had a stage III pressure ulcer.

275.     The Virginia DOH Inspectors completed an inspection report. That report found the following allegations were substantiated:

     a.   Illegal use of restraints

     b.   Violation of Patient Rights

     c.   Violation of Quality of Care requirements

     d.   Violation of requirements for adequate nursing services

     e.   Violation of requirements for adequate dietary services

     f.   Violation of requirement for adequate infectious disease control services

276.     Unbeknownst to the Van Puttens, Virginia had inspected Inova Fairfax a week before the Van Puttens' complaint because of another complaint related to infectious disease control. That inspection found Inova Fairfax not in compliance with the Medicare Conditions of Compliance with respect to infectious disease control, which should have resulted in the hospital losing its contract with Medicare unless there was an adequate plan of correction approved, implemented, and verified by Medicare. Neither Medicare nor Virginia required that there be any remediation, verified or not, of the violations.

277.     On the inspection report for Sharon Van Putten, notwithstanding of its substantiation of the Van Puttens' complaints and the determination that those complaints were Immediate Jeopardy complaints, Virginia found that there was no deficiency in Inova's care.

278.     Medicare has told the press that with respect to Sharon Van Putten's care, a substantiation of the complaint meant the care was deficient: "Federal regulators, though, maintain that a substantiated finding means the care was improper."

279.     The Van Puttens were not advised of these findings even though Medicare regulations require that the complainant get a copy of the investigation report. Instead, the Van Puttens heard nothing from Medicare or the Commonwealth of Virginia until after Sharon Van Putten's death seven weeks later.

280.     Unable to obtain any assistance to remove Sharon Van Putten from an unsafe situation, the Van Puttens requested that she be airlifted to her home in the middle of the Everglades, without any practical ability to have necessary equipment delivered to that location, so that upon arrival she could be then transported by ambulance to a competent facility. This plan posed substantial risk to Sharon Van Putten as she was still in need of full time medical care, and undisclosed to the Van Puttens, Sharon Van Putten had demonstrated severe cardiac instability the night before.

281.     Lacking any further excuses to detain Sharon Van Putten, Inova released her for transport to her home in Florida.

## V.F. SUPPRESSION OF MEDICAL RECORDS RELATED TO CANCER

282.     To facilitate treatment in Florida, Sharon Van Putten requested certain medical records to accompany her, to include all imaging and imaging reports and all infectious disease information.

283.    The records provided to Sharon Van Putten had removed from them all references that would have put either the Van Puttens or Sharon Van Putten's treating physicians on notice that she almost certainly had lung cancer. The only imaging report provided, out of 4 chest CTs and approximately 25 chest X-rays, was the one chest X-ray that made no mention of the lung cancer. The reports requesting urgent follow up were not provided.

284.    The medical records also lacked any information about the multi-drug resistant Klebsiella infection and what antibiotics it had remaining sensitivity to.

285.    Social work notes for Sharon Van Putten indicate that Inova COO Patrick Christiansen and Head of Inova Fairfax Risk Management David Duncan were responsible for the decision as to what records would be disclosed to Sharon Van Putten.

286.    While Sharon Van Putten was en-route to Naples, Inova located a Skilled Nursing Facility in Naples and Sharon Van Putten was re-routed there.

287.    The records Inova Fairfax provided to that Skilled Nursing Facility, Heritage Nursing, lacked disclosure of the growing cancer and deliberately misrepresented the infection as not a "superbug." A draft of the Discharge Summary, provided to family, explicitly acknowledged and stated that it was an ESBL Klebsiella while the Summary provided to Heritage Nursing scrubbed the ESBL from the description. Undoubtedly a sub-acute nursing facility, with a once a week physician visit, would not have accepted a patient with a superbug and the attendant additional risks to its other patients. A failure to warn Heritage Nursing (as well as the air ambulance and transport to and from the airport personnel) evidenced a callous and deliberate disregard for human life.

288.    The misrepresentation of the nature of Sharon Van Putten's infection meant that Heritage did not employ appropriate infectious disease precautions, thus putting all other patients

at that facility of risk of death. When Sharon Van Putten was later transferred to another hospital, that facility, lacking such information, also did not implement required infectious disease protocols, putting all patients at that facility at risk of death.

289.     The misrepresentation of Sharon Van Putten's cancer status and the refusal to provide necessary medical records meant that when Sharon Van Putten had difficulty maintaining consciousness when upright due to gallon of fluid in her chest (from the cancer) compressing her lungs and heart, Heritage Nursing had no idea of what was wrong.

290.     Sharon Van Putten suffered greatly because maintaining placement at Heritage required one hour a day of physical therapy each day, which required an upright position. So, for an hour a day, Sharon Van Putten suffered feelings of suffocation and severe chest pain.

291.     Had Sharon Van Putten's cancer status been disclosed and not covered up, placement at a Skilled Nursing facility would have been deemed an inappropriate placement. Sharon Van Putten required hospitalization to remove the fluid from her chest cavity. Proper placement was either a hospital or by that time, hospice.

292.     The Virginia QIO found that Inova Fairfax's failure to disclose Sharon Van Putten's tumor status to multiple health facilities, over the course of several months, failed to meet minimum professional standards.

293.     Based on the medical literature, when the cancer was first found, Sharon Van Putten could have undergone surgery, with a 60% survival rate at 5 years.

294.     Sharon Van Putten was diagnosed in Naples with extensive stage small cell lung cancer, with no chance of survival for more than weeks, on October 5, 2011, a mere eight days after having been discharged from a month-long stay at Inova Fairfax, with several weeks having been spent in Inova Fairfax's new Acute Pulmonary Unit under the care of a bevy board-certified

pulmonologists, all of whom served on Inova's Cancer Services, and all of whom failed to follow the most basic of algorithms for the assessment of a lung nodule.

295.    Sharon Van Putten died on November 9, 2011 from lung cancer. Treatment for the lung cancer was greatly complicated by the presence of the multi-drug resistant Klebsiella, which had caused an infection of the spine at the site of the stage IV pressure ulcer, caused by Inova. The necessary treatment for the cancer was frequent chemotherapy which suppresses the immune system. Treatment for the Klebsiella, which resulted in osteomyelitis, meant removing all metal hardware from Sharon Van Putten (who had metal in her hips, metal hardware in the spine, and metal hardware in the wrist) and then having her be on high-dose antibiotics for several months. The two treatments were incompatible. The result of Inova's failure to provide care that complied with Medicare standards and Medicare and Virginia's refusal to hold Inova accountable for substandard care was an agonizing death.

296.    Treatment for the lung cancer was also complicated by Sharon Van Putten's poor nutritional status, caused by Inova's extensive deprivation of nutrition.

### V. G. POST-DEATH EFFORTS TO SEEK REMEDIATION/JUSTICE REDRESS OF SURVEY ERRORS

297.    On or about November 11, 2011, the Van Puttens received the report from the Virginia Inspectors.

298.    The version of the report provided to the Van Puttens at that time showed only substantiation of the complaints related to illegal restraints and infectious disease control, with no requirement for remediation.

299.    The Van Puttens have since learned that the inspection report was altered, reportedly by a Virginia inspection supervisor, after the fact.

300.     It was represented, in writing, by the Head of the Virginia Department of Health, that the alteration had been done to correct "typographical errors" In fact, the alterations simply changed the conclusions and added a new section, apparently not written by the inspectors, claiming to document interviews of families regarding conditions at the hospital.

301.     Alteration of the report constitutes federal obstruction of justice.

302.     A complaint about the altered report was made to the Medicare Regional Office, HHS/OIG, the Virginia Attorney General, the Secretary of Health and Human Services, and the CMS Administrator.

303.     In a phone call, Carissa Sanchez, the lead investigator assigned to the Van Puttens' complaint, stated that the failure to hold Inova Fairfax accountable had been a deliberate decision "for the greater good;" that it had been done as a result of Congressional direction; that Inova would be "held accountable over her dead body"; and that Ms. Debra Van Putten should be happy with the result because after all, Ms. Debra Van Putten was a Republican and Republicans are for less government.

304.     Carissa Sanchez then ordered the same investigators to investigate some of the Van Puttens' additional complaints, which resulted in bizarre investigation reports that wholly made up and misquoted Sharon Van Putten's medical record.

305.     Ms. Sanchez, a program management employee, responded to FOIA requests by the Van Puttens. Ms. Sanchez was not a designated FOIA officer, as required by HHS regulations. Those responses deliberately omitted information derogatory of Ms. Sanchez's performance.

306.    On May 31, 2012, the Van Puttens met, telephonically, with Nancy O'Connor, the head of Medicare's Philadelphia Regional Office to discuss the mishandling of the Van Putten's complaint. Tim Hoke and J. William Roberson and Carissa Sanchez were also on the call.

307.    Ms.O'Connor indicated that resolving this issue would be her "highest priority." Except for a letter confirming a request for an additional state investigation issued in July 2012, the CMS Regional Office has not been heard from.

308.    Health and Human Services Office of Inspector General refused to investigate our concerns of misconduct and obstruction of justice.

309.    We have contacted the Department of Justice, Office of Civil Rights and Office of Public Integrity, with no response.

310.    We have contacted the FBI and the U.S Attorney for the Eastern District of Virginia, with no response.

311.    We have reported the abuse and neglect of Sharon Van Putten, resulting in death, to the Virginia State Police and the Attorney for the County of Fairfax, with no response.

312.    We have contacted the Attorney General for Virginia concerning the death of Sharon Van Putten due to abuse and neglect, a crime under Virginia law, who returned our complaint to us apparently untouched, with a letter stating it was a private matter.

313.    Medicare has ordered Virginia not to release the various versions of the Virginia inspection report under FOIA. Upon information and belief, the Van Puttens still do not have a complete and accurate copy of the inspection report.

314.    Medicare, by and through J. William Roberson, has recently written Virginia congratulating the Virginia Inspectors for their diligent and excellent work in performing the inspections.

315.    Medicare has refused to reopen the state investigation on the basis that it cannot perform "an after the fact investigation." The Van Puttens note that Medicare was present during the performance of many of the complained of activities and that by their nature, investigations typically require "after the fact" retrospective activity.

## V.H. VIRGINIA QIO

316.    On separate track, when the Van Puttens complained to Janice Hoffman, CMS General Counsel, she referred that complaint to the Virginia Quality Improvement Organization (QIO).

317.    The Van Puttens were not contacted by the Virginia QIO until after Sharon Van Putten had been flown to Florida.

318.    The Virginia QIO has the contractual responsibility of ensuring that physician and hospitals services in Virginia meet Medicare requirements, federal and state law, and professional quality standards.

319.    Due to distress over Sharon Van Putten's death, the Van Puttens were unable to provide immediately the necessary written documentation and records that the Virginia QIO required to begin an investigation immediately, but did provide a detailed complaint in February 2012, receipt of which was documented contemporaneously.

320.    At that time, the Virginia QIO indicated that it would not consider in its review any information not contained in Sharon Van Putten's medical record at Inova. Excluded then would be family-provided information as well as any and all documentation, observations, photos and other testimony from transporting and receiving facilities.

321.    There is no basis in statute, regulation, or Medicare guidance for this undue restriction in the QIO's review.

322.     Medicare's Philadelphia Regional Office administers the Virginia QIO contract and this undue restriction was discussed in the telephone conference with Nancy O'Connor, the Regional Administrator.

323.     Ms. O'Connor agreed to correct this misapprehension with the Virginia QIO.

324.     Medicare's internal manuals governing QIO exercise of their responsibilities are clear that beneficiary and external witness statements are to be considered.

325.     The Virginia QIO advised the Van Puttens that it had never made a report to HHS/OIG during the twenty years it had performed on the QIO contract.

326.     This admission of dubious performance of its contract responsibilities was reported to Nancy O'Connor of the Philadelphia Regional Office during the May 31, 2012 phone call.

327.     Ms. O'Connor agreed to address the Virginia QIO's understanding of its obligations to report to HHS/OIG with the Virginia QIO.

328.     On February 19, 2013, the Virginia QIO sent to the Van Puttens a final beneficiary letter informing them of the results of the QIO review.

329.     The Virginia QIO found that Inova Fairfax and its physicians' care failed to meet minimum professional standards with respect to the following items:

    a.  The failure to provide prompt evaluation and treatment of the spinal cord injury in the emergency room at Inova Fairfax.

    b.  The infliction of a severe pressure ulcer during the period of July 1, 2011 through July 21, 2011.

    c.  The infliction of a severe pressure ulcer during the period of August 29, 2011 through September 27, 2011.

66

d.  The failure to provide adequate discharge instructions with respect to the lung

tumor on July 21, 2011 and September 27, 2011.

330.    The Virginia QIO's final beneficiary letter omits any consideration of whether

these violations were gross and flagrant violations.

331.    The Virginia QIO's final beneficiary letter fails to document the recommendation

of any sanctions or any other remediation, even though such is required.

332.    Based solely on the findings contained in the Virginia QIO final beneficiary letter

and Medicare reporting to Congress of the incidence and co-incidence of "adverse events"

(which include pressure ulcers and hospital acquired infections) in Fiscal Year 2011, Sharon Van

Putten suffered the worst quality of care for any Medicare patient in the United States in that

fiscal year.

333.    Attached to the QIO Final Beneficiary letter was Inova Fairfax's response to the

QIO.  That response echoed previous communication from Inova Fairfax in refusing to

acknowledge any derogation from the standard of care in its services to Sharon Van Putten.

334.    The Inova Fairfax letter is inconsistent with any proposal by Inova Fairfax to

remediate its deficient quality of care.

335.    The QIO failed to find a violation with respect to starvation. The reviewer write-

up indicates a lack of information and it appears that Inova Fairfax failed to disclose all of the

medical records it possessed, as the starvation was clearly documented on an hourly basis in

handwritten nursing notes.

336.    The QIO failed to find a violation with respect to the continual, 10 day long,

overdose of decadron/dexamethasone (a steroid). In so doing, the QIO refused to enforce clearly

stated FDA limits on the prescribing of this medication.

337.     The QIO failed to find a violation with respect to the administration of antipsychotics as a physical restraint after their administration had been refused in writing. No emergency existed that prevented Inova Fairfax from seeking a court order allowing it to administer these drugs over the patient's refusal, which right to refuse is deemed a vested right under US law.

338.     The QIO failed to find a violation with respect to the failure to provide medical care during Sharon Van Putten's first two emergency room visits at Inova Fair Oaks. This was caused by the QIO failing to review information outside of the four corners of Inova's medical records.

   a.  The QIO erroneously and unreasonably credited false and altered documentation of neurologic exams, despite medical record, outside of Inova's possession, that disproved that assertion.

   b.  The QIO erroneously and unreasonably credited Inova's false records that Sharon Van Putten had a pre-existing tumor that explained the new lung tumor, when medical records from other facilities (provided to Inova and verifiably incorporated into its records) showing that no such tumor existed, were deleted from Inova's official records.

   c.  The QIO erroneously and unreasonably refused to consider records that were in Sharon Van Putten's Inova medical chart, including chest CT reports from other facilities, that showed Sharon Van Putten had no such pre-existing tumor. The patient history summary Allen Van Putten provided to Inova also showed no such pre-existing tumor.

339.    The Virginia QIO erroneously and unreasonably refused to address the Van Putten's complaint that Sharon Van Putten suffered a black eye while in the sole custody of Inova on the basis that such required an investigation the QIO could not perform, even though the fact of the black eye and lack of incident reporting was documented in Inova's own records.

340.    The Virginia QIO erroneously and unreasonably downgraded the harm suffered by Sharon Van Putten by refusing to consider family discussion of the pain and emotional distress caused by Inova's failures.

341.    The Virginia QIO erroneously and unreasonably refused to consider Inova's failure to inform the patient of her medical condition and to allow her and her health care representatives to actively participate in health care decisions, including discharge planning.

342.    The Virginia QIO erroneously and unreasonably failed to consider Inova's violation Sharon Van Putten's statutory right to be treated by the provider of her choice by mischaracterizing her medical status and altering provided medical records for the purpose of thwarting a transfer—which transfer would have revealed Sharon Van Putten to be a victim of criminal abuse and neglect by Inova Fairfax.

343.    The Final Beneficiary letter includes a notice of 42 CFR 480, which permits the recipient of the final Beneficiary letter to disclose the letter but subjects any recipient of that disclosure to risk of federal prosecution if that downstream recipient rediscloses the report.

344.    The Van Puttens wrote CMS Administrator Tavenner and HHS Secretary Sebelius to protest the QIO's failure to require any remediation and failure to recommend sanctions, as mandated under federal statute and regulations.

345.    The first response to this correspondence was made through the CMS Ombudsman's office and Medicare defended its lack of action by stating that the QIO had failed to find any regulatory violation.

346.    The second response, from Dr. Patrick Conway, CMS's Chief Medical Officer, states that the QIO did consider whether Inova's violation was a gross and flagrant violation.

347.    CMS CMO Conway represents that the regulatory standard for "gross and flagrant" is "we only consider care that is obviously wrong or exceptionally culpable."

348.    This is not the regulatory definition for gross and flagrant. Rather, the regulatory definition, cited above, looks to the degree of patient harm or risk of patient harm.

349.    Furthermore, even using CMS Chief Medical Officer Conway's self-created, extra-legal definition of "gross and flagrant," surely the worst case of care provided in the entire United States in a fiscal year should be viewed as "obviously wrong or exceptionally culpable."

350.    The legal warnings and threat of prosecution on QIO reports about disclosure provide a substantial impediment to understanding how Medicare actually implements QIO enforced standards and in seeking legal redress of wrongs.

351.    Nonetheless, the Van Puttens have learned that a Medicare QIO has failed to view as a gross and flagrant violation the suffocation for fifteen minutes of a long term care facility patient due to the dislodging of an improperly sized and managed tracheostomy tube, with facility personnel ignoring the ringing of alarms during the entire event. This suffocation resulted in the patient being in a coma for six months and then dying. This patient also suffered a severe and large bedsore.

352.     CMS Chief Medical Officer Conway does confirm that sanctions are mandatory in the event of a gross and flagrant violation, "When care is determined to be a gross and flagrant violation, initiating the sanction process is required."

353.     Finally, CMS Chief Medical Officer Conway indicates that only recently, and apparently after the final beneficiary letter was sent, the Virginia QIO required the hospital and physicians to undertake a proposal for remediating their poor quality of care, with a due date of early May, 2013. According to Medicare regulations, the Van Puttens, as complainants, must be informed of the remediation required of Inova.

354.     By the terms of Chief Medical Officer Conway's letter, as of June 4, 2013, the QIO had not received acceptable plans from anyone, as the receipt of acceptable remediation plans is described as a future event. Even if permanent paraplegia and death are not considered "substantial patient harm" such that remediation, rather than sanctions were legally appropriate, such failure to provide an acceptable remediation plan legally results in sanctions against Inova prior to the Final Beneficial Letter.

355.     In any case, Medicare regulations require sanctions, not remediation, in the event of a gross and flagrant violation.

356.     Accordingly, upon information and belief, Medicare is simply refusing to effectuate the mandatory statutory and regulatory sanction-initiating role for QIOs.

## V.I.  BUSINESS RELATIONSHIPS BETWEEN VIRGINIA AND INOVA FAIRFAX HOSPITAL

357.     The Inova Fairfax Hospital and land are leased from Fairfax County.

358.     Fairfax County is a subdivision of the State of Virginia.

359.     Upon information and belief, Fairfax County requires that it have a seat on the Board of Directors for Inova Hospital System as part of that lease.

71

360.     Fairfax County has a county employee on the Board of Inova Hospital Systems.

361.     The origins of Fairfax Hospital/Inova Hospital stem from enabling legislation and provision by the County of Fairfax. This is documented in City of Fairfax vs. Fairfax Hospital Association, 562 F.2d 280 (4th Cir. 1977).

362.     The Van Puttens have been unable to obtain to a copy of the current business arrangements between Fairfax County and Inova Hospital Services, despite a Virginia Freedom of Information Act request to the County Attorney, requesting same.

363.     Publically available records show Inova consistently providing the Fairfax County Health Advisory Board with detailed operational and financial performance and planning. No other hospital has a similar reporting performance.

364.     In 2010, Inova entered in contract with Fairfax County for the purchase of land to expand its facilities at Inova Fairfax. Contemporaneous with that purchase agreement was a development agreement between Fairfax County and Inova.  The Fairfax County Attorney has failed to disclose the terms of that agreement despite a valid Virginia FOIA request.

365.     Virginia has an extensive regulatory process whereby health care providers are not permitted to expand services without state approval.

366.     Under the Virginia Certificate of Public Need regulations, Inova had obtained a dominant share of the Northern Virginia hospital market. According to a 2008 FTC complaint, Inova had 67% of all hospital beds and 74% of all hospital revenue in Northern Virginia.

367.     To facilitate the expansion of the Inova Fairfax facility, the Industrial Development Board of Fairfax County, also a subdivision of the Commonwealth of Virginia, issued revenue bonds in the amount of $495 million in July of 2012. The proceeds of the bonds were to be disbursed to Inova Fairfax under a loan agreement.

72

368.    These bonds were part of a long-standing practice of the Virginia's Industrial Development Board of Fairfax County to providing access to funding to Inova.

369.    The disclosure documents for the July 2012 municipal bond issuance specifically represented that Inova did not anticipate any regulatory action which would materially affect its standing with Medicare. Specifically, Inova, on behalf of Virginia, represented that it was not aware of any claim or threatened action with respect to patient transfers that could materially affect revenue or operations.

370.    At the time of this disclosure, the Van Puttens' complaints, with pending investigations, were open at the Virginia Office of Licensure and Certification, as confirmed by both Medicare and Virginia, and open with the Virginia QIO.

371.    Accordingly, during the pendency of the Van Puttens' complaints, Virginia was a business partner of Inova and a lender to Inova, while at the same time responsible for regulating Inova and protecting Sharon Van Putten from medical care that did not meet minimum professional standards under its contract with Medicare.

372.    An enforcement action against Inova Fairfax Hospital that could result in termination of its contract with Medicare was contrary to the pecuniary interests of Virginia, per the contracts and multiple business relationships between Inova Fairfax and Virginia.

## V.J. THERE IS A LONG HISTORY OF VIRGINIA/MEDICARE NOT REQUIRING INOVA TO REMEDIATE VIOLATIONS

373.    Virginia has found Inova not to be in compliance with the Conditions of Participation without requiring documented remediation.

   a.  On April 4, 2008 Virginia found Inova Fairfax to be in violation of its obligations under the Medicare Conditions of Participation to provide appropriate Quality

Control and Improvement. Risk Management did not flag serious complaints until there was a family complaint about a medication error related to a high-risk medication. Inova had no process for incident reports to be addressed by anyone outside of risk management. Virginia did not require Inova to verifiably document remediation of this failure and it remains uncorrected in the inspection records.

b. On September 9, 2011, Virginia found Inova Fairfax to be in violation of its obligations under the Medicare Conditions of Participation with respect to infectious disease control. Documented derogations included potentially allowing unauthorized persons in operating rooms, the use of expired/undated medication, the use of expired and undated supplies, and the inability to clean equipment. Virginia did not require Inova to verifiably document remediation of these failures and they remain uncorrected in the inspection records.

c. On August 8, 2012, Virginia found Inova Fairfax to be in violation of its obligations under the Conditions of Participation with respect to its providing notification of its grievance system. There has been no verification of subsequent complaint and this remains uncorrected in the inspection records.

d. On July18, 2007, Virginia found Inova Fair Oaks was not in compliance with the Condition of Participation related to Emergency Services because it failed to provide triage assessment, diagnostic and care intervention in appropriate time frames, according to the patient's chief complaint. There was no plan of correction and the deficiency remains uncorrected in the inspection reports.

## VI. COUNT 1—ADMINISTRATIVE PROCEDURES ACT

374.     Plaintiff incorporates and restates the above paragraphs as if fully set forth herein.

375.     5 USC §702 provides that a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

376.     5 USC §706 provides that to the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall -

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be -
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

377.    Sharon Van Putten suffered legal injury and was aggrieved due to Medicare's Philadelphia Regional Office's abuse of its discretion by failing to enforce Medicare quality standards and patient rights.

378.    Sharon Van Putten suffered legal injury and was aggrieved due to Medicare abusing its discretion by employing a contractor, Virginia, to enforce Medicare quality standards and patient rights that had an irresolvable conflict of interest in that it was a business partner and financier of the hospital being inspected, and had a financial interest in the hospital having a clean regulatory record.

379.    Sharon Van Putten suffered legal injury and was aggrieved due to contractors of Medicare abusing their discretion in not following Virginia state law with respect to the reporting of criminal neglect and abuse.

380.    Sharon Van Putten suffered legal injury and was aggrieved due to Medicare abusing its discretion by continuing to allow Inova Fairfax and Inova Fair Oaks to continue to participate in the Medicare program while such facilities were not qualified facilities under Medicare regulations and Medicare was on notice that they were not qualified because they had failed to comply with remediation requirements.

      a.   Sharon Van Putten had a right to choose treatment at a qualified facility and the reasons for lack of qualification directly resulted in severe and fatal injuries.

381.    Sharon Van Putten suffered legal injury and was aggrieved when Medicare contractors abused their discretion in providing inspection services that failed to review her medical record and manufactured findings that were in error.

382.    Sharon Van Putten suffered legal injury and was aggrieved when Medicare contractors abused their discretion by altering the inspection report for the purpose of minimizing Inova Fairfax's failure to comply with Medicare requirements.

383.    Sharon Van Putten suffered legal injury and was aggrieved when Medicare's contractors abused their discretion by fabricating misleading quotes to eliminate Inova Fair Oaks' regulatory jeopardy.

384.    Sharon Van Putten suffered legal injury and was aggrieved when Medicare's inspection supervisory staff – Carissa Sanchez, Tim Hock, J. William Roberson, and Nancy O'Connor – abused their discretion by not acting when Virginia submitted an inspection report finding substantiation of claims of illegal restraint and poor infectious disease control. Medicare Guidance documents indicate that the use of illegal restraints is always a Condition-Level violation requiring either remediation or termination. Illegal restraint is a clear violation of one's right to liberty.

385.    Sharon Van Putten suffered legal injury and was aggrieved when Medicare's inspection supervisory staff abused their discretion by failing to act in response to an inspection report whereby a doctor is quoted as giving the reason for starving a patient that she was a paraplegic – a criminal violation of Sharon Van Putten's civil rights.

386.    Sharon Van Putten suffered legal injury and was aggrieved when Medicare's inspection supervisory staff – Carissa Sanchez, Tim Hock, J. William Roberson and Nancy O'Conner – abused their discretion by accepting as correct an inspection report that was facially deficient in that it found complaints to have been substantiated but not deficient and was generally incoherent gibberish, with recitations of fact bearing no relationship to the allegation of poor care.

387.    Sharon Van Putten suffered legal injury and was aggrieved when Medicare's inspection supervisory staff – Carissa Sanchez, Tim Hock, J. William Roberson and Nancy O'Conner – abused their discretion when they accepted an inspection report that did not address one key complaint that had been included in the request for inspection – that Inova had administered mind altering substances to Sharon Van Putten after a specific and written refusal.

388.    Sharon Van Putten suffered legal injury and was aggrieved when Carissa Sanchez, Tim Hock, J. William Roberson and Nancy O'Conner abused their discretion when they chose not to order a federal inspection to resolve inconsistencies in the response to an immediate jeopardy level compliant, the prescribed procedure in the State Operations Manual for that situation.

389.    Sharon Van Putten suffered legal injury and was aggrieved when Carissa Sanchez, a program officer, abused her discretion when she answered a FOIA inquiry and omitted a substantial amount of information that negatively reflected Sanchez's performance, without any documentation that responsive material was being omitted.

390.    Sharon Van Putten suffered legal injury and was aggrieved when Tim Hock, a supervisory program officer, abused his discretion when he answered a FOIA inquiry rather than the FOIA officer, and omitted a substantial amount of information in the possession of the Philadelphia Regional Office from the FOIA response.

391.    Sharon Van Putten was afforded no administrative process to contest any of these actions, or to contest the application of co-payment rules. No administrative process was afforded to effectuate legal standards in a timely fashion with respect to multiple Medicare contractors that resulted in her involuntary confinement, severe suffering, pain, disablement, disfigurement and eventually death. Indeed, inspectors advised that they would consider NO

information from the family as it was inherently unreliable. Carissa Sanchez and the Virginia DOH Inspectors indicated that they viewed information received from medical providers as inherently reliable.

392.    The initiation of the QIO process, which had no authority to immediately effectuate the legal standards, started after Sharon Van Putten left the hospital, and which typically lasts a year, did not constitute a constitutionally adequate remedy, as nothing was done until Sharon Van Putten had been dead for more than a year.

393.    The only formal administrative process that exists is dependent on the hospital providing a formal notice. Having an adverse party that is the subject of the complaint controlling access to the administrative process does not meet constitutional fifth and fourteenth due process requirements.

394.    Medicare refused to provide any administrative process for Sharon Van Putten to appeal a reduction in the level of care because Inova failed to provide the requisite notice.

    a.  Dr. Bloom placed Sharon Van Putten on hospice care (actually less than hospice care) rather than acute level care, without notice and without permission, when he declared she was "end stage COPD" withheld COPD medications and all nutrition.

    b.  Patrick Christiansen, David Duncan, Barry DiCicco and Greg Trimble reinstituted the "hospice level" care when they stopped terminated efforts for diagnosis and care for the lung cancer and concealed from Sharon Van Putten, her family, and her other medical providers information that fact of the lung cancer and the need for expedient care.

395.    Sharon Van Putten suffered legal injury and was aggrieved when the National QIO abused its discretion when it failed to immediately perform a quality of care review.

396.    Sharon Van Putten suffered legal injury and was aggrieved when either Medicare abused its discretion when it failed to promptly notify the Virginia QIO or the Virginia QIO failed to promptly act on the Van Puttens' complaint.

397.    Sharon Van Putten suffered legal injury and was aggrieved when the Virginia QIO, a Medicare contractor, abused its discretion when it failed to consider any information other than what Inova, a Medicare contractor, recorded in its records, demonstrably erroneous or not, missing information or not.

398.    Sharon Van Putten suffered legal injury and was aggrieved when the Virginia QIO, a Medicare contractor, abused its discretion when it failed to find Inova Fair Oaks, a Medicare contractor, not to have provided care that minimal professional standards on the Emergency Room visits on June 27, 2011 and June 30, 2011, when the X-ray performed on that date clearly showed a broken spinal stabilization rod, a burst fracture of the spine in that location and likely compression of the spinal cord, combined with symptoms consistent with a spinal cord injury and no neurological consult was ordered and where Inova records obviously record false information that a neurologic exam was performed.

   a.  It should be noted that the fact that Inova likely had substantial malpractice liability risk should have been readily appreciated within minutes of Sharon Van Putten arriving at Inova Fairfax. We were told that risk management had provided special instructions, "because Sharon Van Putten was a liability risk." In no way should the Inova's records be viewed as documentation created by a neutral party.

   b.  The complaint concerning inappropriate care on June 27, 2011 was not even addressed.

399.    Sharon Van Putten suffered legal injury and was aggrieved when the Virginia QIO, a Medicare contractor, abused its discretion when it failed to consider whether Inova Fairfax's (a Medicare contractor) delay in treating Sharon Van Putten's spinal cord injury on July 1, 2011 to July 2, 2011 constituted a gross and flagrant violation.

    a.  Delaying treatment such that a patient is at risk of permanent paraplegia from the bra-line down "presents an imminent danger to the health, safety, or well-being of a program patient or places the program patient unnecessarily in high-risk situations."

    b.  The Virginia QIO and Medicare failed to require that claims for services that did not meet minimum professional services be denied, as within its authority and as required by Medicare claims payment regulations, causing her estate to be subject to Medicare Secondary Payer liability in the event of a settlement or recovery.

400.    Sharon Van Putten suffered legal injury and was aggrieved when the Virginia QIO, a Medicare contractor, abused its discretion when it determined that Inova Fairfax, a Medicare contractor, met minimum professional standards when administering dexamethasone to Sharon Van Putten.

    a.  The Virginia QIO failed to consider that Inova Fairfax violated FDA limits on dosing of dexamethasone.

    b.  The Virginia QIO failed to consider Inova Fairfax violated FDA requirements that a valid prescription be issued for the administration of dexamethasone and that Inova Fairfax administered dexamethasone for ten days without a valid prescription (the medication having been discontinued by the prescribing physician).

c.  The Virginia QIO failed to consider that the dexamethasone caused severe steroid psychosis and cardiac issues, which are clearly listed as dose dependent side effects and that Inova Fairfax failed to recognize adverse reactions.

d.  The Virginia QIO failed to consider unambiguous documentation in the medical record evidencing severe hallucinations caused by the steroid overdose.

e.  The Virginia QIO failed to consider evidence from Sharon Van Putten's family concerning the harm caused by the administration of dexamethasone and Inova's refusal to disclose to the Van Puttens what drugs she was on, in the face of the Van Puttens suspecting a drug overdose, specifically of steroids, which is documented in Sharon Van Putten's medical records.

f.  The Virginia QIO, a Medicare contractor, clearly abused its discretion and had no basis for finding, "the time your mother was on steroids did not impact her course or outcome" given the resulting steroid psychosis and heart attack.

    i.  They failed to address the documented fact that the steroid overdose kept Sharon Van Putten in the hospital for an additional two weeks, with resulting Stage III pressure ulcer (eventually contributing to her early death), sepsis, a long recovery phase (the effects of the steroids were even documented in the rehab facilities records).

    ii.  The steroid overdose was psychologically extremely damaging, with effects that lasted the rest of Sharon Van Putten's life.

    iii.  The medical literature, which indicates a near certain risk of steroid psychosis at a dosing one-tenth of what Inova Fairfax administered.

iv.  The overdose should have caused a flag from Inova Fairfax's pharmacy. The fact that there is apparently no system in place to flag a dose well in excess of FDA limits represents a substantial risk to all patients at Inova Fairfax.

g.  The Virginia QIO, a Medicare contractor, failed to consider that the high dose of steroids posed a severe risk to Sharon Van Putten, given

401.    Sharon Van Putten suffered legal injury and was aggrieved when the Virginia QIO, a Medicare contractor, abused its discretion when it failed to consider whether Inova Fair Oaks (a Medicare contractor) failure to disclose the lung nodule (which was later revealed to be fatal lung cancer), which failed to meet minimum standards of professional care, presented "an imminent danger to the health, safety, or well-being of a program patient or places the program patient unnecessarily in high-risk situations."

a.  The Virginia QIO failed to require that claims for services that did not meet minimum professional services be denied, as within its authority and as required by Medicare claims payment regulations.

b.  The denial of the clearly established right of Medicare beneficiaries to care that meets minimum professional standards resulted in the death of Sharon Van Putten.

402.    Sharon Van Putten suffered legal injury and was aggrieved by the Virginia QIO's abuse of its discretion when it failed to determine that Inova Fairfax's (a Medicare contractor) failure to meet minimum professional standards in causing a Stage III pressure ulcer from July 1 through July 19, 2011 did not constitute a gross and flagrant violation.

a.  A stage III pressure ulcer "presents an imminent danger to the health, safety, or well-being of a program patient or places the program patient unnecessarily in high-risk situations."

b.  The QIO and Medicare failed to require that claims for services that did not meet minimum professional services be denied, as within its authority and as required by Medicare claims payment regulations, causing her estate to be subject to Medicare Secondary Payer liability in the event of a settlement or recovery.

403.     Sharon Van Putten suffered legal injury and was aggrieved by the Virginia QIO's abuse of discretion when it failed to find that restraining Sharon Van Putten, both physically and chemically, did not meet minimum professional standards.

a.  Sharon Van Putten and her representatives, when she was incapacitated, refused the administration of antipsychotics in writing, these drugs were repeatedly administered despite the refusal and Sharon Van Putten, personally and through her representatives, had the right to refuse such medications.

i.  Documentation of the refusal is clearly noted in the text of Sharon Van Putten's medical records on July 10, 2011 and the QIO found that Sharon Van Putten received doses of antipsychotics on July 14, 2011.

ii.  Sharon Van Putten was illegally dosed with antipsychotics in September 2011, even after the drugs were listed as "allergies."

iii.  The refusal was also documented in a large note taped to the front of Sharon Van Putten's medical record, but Inova Fairfax destroyed the note and did not include it in its submission to the Virginia QIO.

iv.  The Van Puttens provided the Virginia QIO with photographs of the note taped to the front cover of Sharon Van Putten's medical chart refusing antipsychotics, but the Virginia QIO refused to consider this evidence.

b. The Virginia QIO abused its discretion when it failed to consider that Inova Fairfax refused to consider lesser alternatives, as is required by Medicare's patient rights, such as:

    i. The use of a sitter.

    ii. Reducing the toxic level of steroids that were causing agitation.

    iii. Prescribing necessary anti-anxiety medications that she was normally prescribed and whose abrupt withdrawal can cause anxiety producing withdrawal symptoms.

    iv. Reinstating Sharon Van Putten's normal dose of Premarin, the abrupt withdrawal of which can cause agitation.

    v. Reinstating Sharon Van Putten's normal dose of antidepressants, used for pain, the withdrawal of which can cause agitation.

    vi. Transferring her to a facility that would not trigger PTSD symptoms because it was where she had been rendered a paraplegic due to poor care.

c. The Virginia QIO abused its discretion when failed to consider that restraints are contraindicated in the instance of delirium, the diagnosis stated for the restraints.

d. The Virginia QIO abused its discretion when it failed to consider that the restraints were ordered by a resident that was practicing as an attending, with no supervision by an attending physician, in violation of state medical practice regulations and Medicare regulations.

e. The Virginia QIO erroneously found that the resident in question, Jason Williams, was "acting in good faith" when in fact the medical record discloses that he knowingly prescribed an anti-psychotic in defiance of a known refusal and after

having been fired from Sharon Van Putten's care and that he knowingly refused to consider the family's pleas that Sharon Van Putten was being overdosed on some medication, which was the cause of the agitation.

f. The Virginia QIO failed to consider that the Virginia Board of Licensure and Certification had found the restraints to be illegal. Under Medicare regulations, Inova Fairfax was obligated to comply with both federal and state law in restraining patients.

g. With respect to the administration of Neurontin, the Virginia QIO erroneously found that a refusal of medication is effective only when recorded by a physician, rather than when issued by an authorized medical decision-maker. Sharon Van Putten received a dose of Neurontin after a refusal of the drug had been clearly and unambiguously communicated to Inova Fairfax medical staff by an authorized medical representative who had been called to the hospital in the middle of the night by medical staff unable to address the iatrogenic agitation Sharon Van Putten was suffering from.

h. The Virginia QIO abused its discretion when it failed to consider information contained in the medical records of other facilities and from the Van Puttens that Sharon Van Putten did not require restraint, that the agitation was wholly iatrogrenic and that the severe agitation was only present when Sharon Van Putten was being mistreated by Inova.

i. The Virginia QIO abused its discretion when it failed to consider obvious falsification of the restraint documentation establishing the need for restraint. In many instances Sharon Van Putten is recorded as being agitated, screaming or

yelling in the restraint justification at the exact same time she is recorded as

sleeping, sedated or obtunded with respect to documentation related to the adequacy

of medication. If she was well-sedated, she did not need to be restrained; if she was

restrained and under medicated, she needed different medication. She could not be

both at the same time and she was restrained nearly continuously for a total of 20

days divided between two hospitalizations.

j.   It should be noted that despite an extensive history of hospitalizations, Inova

Fairfax was the only hospital to ever restrain Sharon Van Putten.

k.   The Virginia QIO failed to consider that a known side effect of anti-psychotics is

swallowing difficulties, a complication that can be fatal for a high-paraplegic and

was evidenced in Sharon Van Putten's medical record.

l.   A violation of a patient's rights to be free from illegal drugging and illegal restraints

cannot be consistent with minimum professional standards, as a matter of law,

given that care must comply with local, state and federal law.

404.    The Virginia QIO, a Medicare contractor, abused its discretion when it failed to

find that the starvation of Sharon Van Putten meant that Inova Fairfax failed to meet minimum

professional standards.

a.   Inova Fairfax ICU nurses recorded every single hour how much nutrition Sharon

Van Putten consumed from all sources (by IV, by feeding tube and by mouth).

b.   Those hand-written notes document that Sharon Van Putten received exactly zero

caloric intake from August 29, 2011 through September 2, 2011. The records are

explicit that there were NO calories administered during this time period.

c.  Doctor notes from this time frame record that Sharon Van Putten reported little or no nutrition during the days before her admission due to poor appetite.

d.  Medical Resident notes from this time frame document the failure of speech therapy, which is responsible for swallow evaluations, to perform a necessary evaluation.

e.  The nurses' hourly handwritten notes document that Sharon Van Putten received exactly 80 calories on September 3, 2011.

f.  The nurses' hourly handwritten notes document that Sharon Van Putten received exactly 270 calories on September 4, 2011.

g.  Doctor's notes clearly indicate that Sharon Van Putten suffered a heart attack due to deprivation of essential nutrients, on August 31, 2011.

h.  The Virginia QIO erroneously found that the family refused to have Sharon Van Putten awakened for swallow testing. Instead, the Van Puttens' contemporaneous, non-alterable notes record the problem as Sharon Van Putten being so severely sedated with Seroquel, "September 2, 2011 Vicki Van Putten Ruiter

"Ok, although Tim is still sick too. There was supposed to be a back to school bash and the first football game last night but we skipped it cause he and I felt so lousy. They gave my mom seriquel which is a drug we have listed as one she isn't allowed to get and she's super sedated. Speech therapy came in to watch my mom eat and drink but couldn't wake her. She kept trying until I said she seemed like she was so sedated that even if she did get her to open her eyes, it wouldn't be safe to have her eat or drink. Duh. Of course she thought she'd wake her up by tickling her toes....not as effective when you have no feeling."

    i.   Upon information and belief, there was no medical impediment to providing Sharon Van Putten with naso-gastric tube feedings and no request for permission for tube feeding was made until September 3, 2011 when an Inova nurse stated that Inova had "made a mistake" and Sharon Van Putten required immediate tube feeding because Inova had "forgot" to feed Sharon Van Putten.

405.    Sharon Van Putten suffered legal injury and was aggrieved when the Virginia QIO, a Medicare contractor abused its discretion when it failed to consider whether Inova Fairfax's (a Medicare contractor) failure to disclose the lung tumor to Heritage Nursing home constituted a gross and flagrant violation.

    a.   Inova Fairfax discharging Sharon Van Putten with a gallon of fluid in the chest cavity and discharging her with undisclosed and untreated terminal lung cancer with a very short life expectancy, to a facility where she was required to perform an hour of hard physical therapy was cruel and depraved.

    b.   Virginia Inspectors, knowing that Sharon Van Putten had terminal lung cancer, allowing Inova Fairfax to keep Sharon Van Putten at Inova Fairfax based on fraud, was cruel and depraved.

    c.   Such cruel and depraved conduct most certainly presented an imminent danger to the health, safety, or well-being of Sharon Van Putten and placed her unnecessarily in a high-risk situation.

406.    Sharon Van Putten suffered legal injury and was aggrieved when both the Virginia State Survey Agency and the Virginia QIO, both Medicare contractors, abused their discretion when they refused to consider in their evaluation information outside of Inova's self-

serving records, to include information provided by her family and validated in other facilities' medical records.

      a.   This unsupported evidentiary limitation allowed Inova Fairfax to continue to provide care that did not comply with Medicare standards so long as Inova Fairfax was not so stupid as to document the poor care in the patient chart.

      b.   Medicare regulations require care than meets minimum professional standards in all circumstances, not just those recorded by in the medical record or those circumstances where the facility has been honest about its conduct.

407.      Beneficiaries have no rights within the QIO process to provide evidence, contest findings or contest the failure to recommend for sanctions that directly dispose of property rights. When beneficiaries receive notice of the QIO's findings and recommendations, the case is closed and unappealable.

408.      The Medicare Defendants abused their discretion in failing to provide necessary oversight and direction to both the Virginia State Survey organization, the Virginia QIO and the National QIO.

409.      Marilyn Tavenner, in her official capacity, abused her discretion by having Medicare direct QIOs to not effectuate their sanction responsibilities and by not overseeing QIOs to ensure that they were assessing if violations were gross and flagrant.

410.      The Medicare Defendants and Marilyn Tavenner in her official capacity abused their discretion in not requiring the Virginia QIO, a Medicare contractor, recommend sanctions in the worst care of care provided to a Medicare beneficiary, in a fiscal year.

411.    Medicare's handling of this matter represents a wholesale refusal to effectuate a substantial regulatory framework intended to protect Medicare beneficiaries and to ensure that they receive the intended value of their vested Medicare benefits.

## PLEA FOR INJUNCTIVE RELIEF – ADMINISTRATIVE PROCEDURES ACT

WHEREFORE, Sharon Van Putten respectfully requests that the Court issue the following injunctive relief:

412.    Declare Inova Fair Oaks and Inova Fairfax Hospitals to be in violation of Medicare's Conditions of Participation and to have been in violation of the Conditions of Participation since September 2011.

413.    Declare that since the time frame for Inova Fair Oaks and Inova Fairfax Hospitals to have demonstrated compliance with the Conditions of Participation as a result of the findings of violations in September 2011 to have long past, that Inova Fair Oaks' and Inova Fairfax's contracts with Medicare are deemed terminated.

414.    Declare that the Commonwealth of Virginia has an irresolvable conflict of interest in enforcing Medicare standards with respect to Inova due to its extensive business relationships with Inova.

415.    Enjoin Medicare from reinstating Inova Fair Oaks and Inova Fairfax to participation in the Medicare program only upon verification of compliance with the Conditions of Participation with respect to all issues raised by the Van Puttens and others, by an entity that does not have a disqualifying conflict of interest, to include certification that the hospitals have evidenced an understanding of the Medicare Condition of Participation that that hospital

management is legally responsible for the quality of care provided to all patients, regardless of whether the provider is an employee of the hospital, a contractor, or otherwise.

416.    Declare that Inova Fair Oaks Hospital, Inova Fairfax Hospital, Aamir Latif, Greg Wagner, Eugene Kim Lee a/k/a Eugene Kim, a/k/a Eugene Lee, Kevin Mahaney, Clifford Lader, Christian Muller, Philip Minshew, Belay Atnafu, Jason Williams, Ellen Vaughey, Matthew Williams, Robert Bloom, Eric Libre, James Lamberti, Thomas McCabe, Mark Granada, Muliya Gowda, Christine Bussey, Barry DiCicco, Marla Shuman, Sabrena Tangri, Gregory Trimble, David Duncan, Patricia McCray and Kate Roman to have failed to have provided services that met minimum professional standards and which constituted gross and flagrant violations of their obligations under Medicare regulations.

417.    Compel Medicare, via the Virginia QIO, its contractor, to make recommendations for sanctions consistent with the serious harm inflicted on Sharon Van Putten; and, with respect to Inova Fairfax Hospital, consistent with the fact that the care that Sharon Van Putten received was the worst care provided to any Medicare beneficiary in the country in an entire fiscal year, per Medicare's own adverse event reporting, to include substantial consideration of exclusion from the Medicare program.

418.    Enjoin Medicare from failing to consider all pertinent evidence of provider's failure to meet Medicare standards with respect to a patient's care, without regard to whether the information is documented in the patient's medical record.

419.    Enjoin Medicare from failing to assess whether care that does not meet minimum professional standards constituted a gross and flagrant violation in accordance with the definition set forth in Medicare regulations.

420.    Enjoin Medicare from allowing or instructing its contractors, the QIOs from failing to recommend sanctions when patient care constitutes a gross and flagrant violation of Medicare requirements.

421.    Enjoin Medicare from failing to respond in a prompt manner to allegations of substantial, imminent or on-going patient harm.

422.    Enjoin Medicare from failing to report observed instances of patient abuse or neglect to appropriate local law enforcement authorities.

## VII.    COUNT II—42 USC SECTION 1983 –VIOLATION OF RIGHTS

423.    Plaintiff incorporates and restates the above paragraphs as if fully set forth herein.

424.    42 USC §1983 provides as follows: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

425.    The Virginia DOH Investigators, the Inova Defendants and the Medicare Defendants jointly deprived Sharon Van Putten of life, liberty, the protection of the law and a multitude of federally established rights to a minimum quality of care under Medicare statutes and regulations, described above, as a result of joint action between Inova and the Commonwealth of Virginia.

426.    The Commonwealth of Virginia, and its subdivision, Fairfax County, created a dangerous situation when it failed to require Inova Health Services to remediate, and instead

condoned, known, dangerous conditions for the purpose of continuing private funding their joint ventures.

427.    Fairfax County, a subdivision of the Commonwealth of Virginia, created a dangerous situation when it employed an employee of Inova to man its Adult Protective Services hotline and that employee refused to take a complaint about abuse and neglect about Sharon Van Putten.

428.    The Commonwealth of Virginia created a dangerous situation when its employees, Debbie Wintermantal and Mary Berryman misrepresented the results of their investigation.

429.    The Commonwealth of Virginia created a dangerous situation when its unnamed supervisor, upon information and belief, Brenda Bagley or Elizabeth King, altered the conclusions of the Virginia inspection in violation of federal law.

430.    The Commonwealth of  Virginia created and condoned a dangerous situation when it issued a public municipal bond offering premised on Inova's alleged past, current and anticipated compliance with Medicare's Conditions of Participation, when in fact, Inova was not in compliance with the Conditions of Participation.

431.    The Commonwealth created and condoned a dangerous situation when Elizabeth King, Erik Bodin, and Maureen Dempsey, then Acting Director of the Department of Health condoned in writing, and in the instance of Erik Bodin, in public statements, Virginia's satisfaction with Inova's conduct and Virginia's conduct of its investigation.

432.    The Commonwealth of Virginia, by and through its medical malpractice laws, and jointly with Medicare, has created and condoned a dangerous situation whereby a health care provider is incentivized to  multiply medical harm, and multiply medical expenses as a means of

94

a perverse method of "risk management" and which deprives indigent estates from access to justice.

    a.  Virginia limits damages for medical malpractice to $2,000,000, plus $250,000 in possible punitive damages.

    b.  The Virginia cap includes all costs for attorneys and all costs of litigation.

    c.  The Virginia law furthermore requires that the plaintiff be legally responsible for expenses.

    d.  There is no cap on what defendants may spend in defense.

    e.  Virginia requires an expert certification of a derogation from the standard of care in order for a plaintiff to file a medical malpractice claim.

    f.  Accordingly, a medical provider that is faced with substantial liability gains a substantial litigation advantage by the infliction of harm by other providers, which can greatly increase the number of experts needed to certify the case (which is expensive) and which makes causation determinations more difficult.

    g.  In this case, Sharon Van Putten was viewed as having a litigable case for malpractice when the sole injury was the spinal cord injury. The likely damages would have been high, due to the substantial costs associated with treating and caring for a person with such a debilitating injury.

    h.  Inova's infliction of the substantial number of other, additional injuries, along with the failure to diagnose and treat the cancer, rendered the case non-litigable because of the expenses associated with the extensive need for expert certification and testimony under Virginia law, even though the Virginia QIO had already found the care Sharon Van Putten received not to have meet minimum professional standards

i.  The family has estimated that it would have taken about a dozen different expert witnesses to address all of the acts of negligence inflicted on Sharon Van Putten and the estimates for costs alone ranged well into the six figures.

j.  It would have been a violation of the law for any Virginia attorney to have accepted Sharon Van Putten's case because her estate had no assets and no anticipated source of any substantial income. Accordingly, it would be unethical for any Virginia attorney to represent the estate. Notwithstanding, federal rules require that the estate be represented by counsel and cannot proceed pro-se.

k.  Furthermore, had Sharon Van Putten been able to file suit, it is unlikely that her estate would have seen a penny in return due to the cost of expert certification, expert testimony and attorney's fees. Indeed, it is likely that even with a full statutory recovery, the attorney's fees would not have been covered.

l.  Medicare law allows Medicare to recoup all that it has paid from a successful plaintiff.

m.  As a result of Medicare's refusal to recoup amounts paid erroneously from the Medicare Defendants, any recovery would have likely largely been taken by Medicare.

n.  This issue has been raised to Defendant Tavenner and she has refused to waive any right of recovery by Medicare, despite Medicare's own findings that they should not have paid in the first place.

o.  Therefore, Virginia law effectively precludes any meaningful recovery for a meritful case, with the harm being death. This violates due process

p.  The combined result of the policy of Virginia not to hold Inova accountable, the

policy of Medicare not to enforce patient safety rules, the refusal of law

enforcement to even take a criminal or adult protective services complaint, and the

severe burden that Virginia law imposes in seeking recovery for medical

malpractice (which is basically defined as any tort performed by a medical

professional) Sharon Van Putten was deprived of life with absolutely no pre- or

post-deprivation remedy. This is a violation of her right to due process of law.

433.    Sharon Van Putten's rights under the Medicare Conditions of Participation and

the Social Security Act were violated as a result of the danger caused by the Commonwealth of

Virginia and its employees combined with Inova and providers taking advantage of the lack of

regulatory oversight to provide poor care.

434.    As a result of the Commonwealth's actions by and through its employees Debbie

Wintermantel, Mary Berryman, Brenda Bagley, Erik Bodin, and Elizabeth King, Sharon Van

Putten was deprived of her right to choose a qualified Medicare provide, since unqualified

facilities were permitted to continue as Medicare providers, including Inova Fairfax and Inova

Fair Oaks.  Sharon Van Putten was deprived of the ability to transfer from Inova to another

facility and Inova's previous poor care in violation of the Conditions of Participation rendered it

an unqualified facility under federal regulations.

435.    As a result of the Commonwealth's actions by and through its employees Debbie

Wintermantel, Mary Berryman, Brenda Bagley, Erik Bodin, and Elizabeth King, and an

unnamed employee of the Fairfax County Adult Protective Services, in conjunction with Inova,

Aamir Latif, Greg Wagner, Kevin Mahaney, Eugene Kim Lee, Philip Minshew, Christian

Muller, Clifford Lader, Belay Atnafu, Robert Bloom, Eric Libre, Lamberti, Marla Shuman,

Barry DiCicco, Kate Roman, Patrick Christiansen, David Duncan and Sabrena Tangri, Sharon Van Putten was deprived of her liberty and her right to interstate travel without due process of law.

436.    As a result of the Commonwealth's actions, by and through its employees Debbie Wintermantel, Mary Berryman, Brenda Bagley, Erik Bodin, and Elizabeth King, in conjunction with Inova, Eugene Kim Lee, Ellen Vaughey, Robert Bloom, Eric Libre, James Lamberti, Marla Shuman, Barry DiCicco, Kate Roman, Patrick Christiansen, David Duncan and Sabrena Tangri deprived Sharon Van Putten of life without due process of law.

437.    Sharon Van Putten was deprived of life, liberty, the protection of the law and a multitude of federally established rights to a minimum quality of care under Medicare statutes and regulations, described above, under a custom of the Commonwealth of Virginia not to enforce regulatory requirements with respect to Inova Hospitals.

438.    Sharon Van Putten was deprived of life, liberty, the protection of the law, and a multitude of federally established rights to a minimum quality of care and the right to choose a medical provider, described above, as well as the right to be free from abuse, as a result of the failure to protect by the Virginia Inspectors and the unnamed Fairfax Adult Protective Services employee.

439.    As a result of these multiple failures, Sharon Van Putten incurred $854,088.64 in medical expenses, $6,295.00 in final expenses, and $168,996.00 in lost income.

440.    As a result of these multiple failures Sharon Van Putten endured great pain and suffering.

441.    The most recent statement received from Inova, dated December 12, 2012, on behalf of Inova and its employees/contractors was that "All care and tests provided to Mrs. Van

Putten were in accordance with the professional judgement of the clinicians and Inova believes such care was appropriate."

442.    This failure to recognize that Inova's services were grossly defective, if not criminally abusive and neglectful, is a serious deviation from Inova's obligation under the Conditions of Participation to be legally responsible for the care provided at its facility.

443.    "Deny and Defend" in cases of clear violation of Medicare rules is an appropriate basis for terminating a hospital's contract under Medicare.

444.    Inova's failure to comply, along with Virginia's failure to hold Inova accountable, is ongoing.

WHEREFORE, Sharon Van Putten respectfully requests that the Court issue the following relief:

445.    Damages in the amount of $1,031,352.64.

446.    Punitive damages in the amount of $450 million, the amount Inova obtained by Virginia reporting Inova to be in compliance with its obligations under Medicare when it was not.

447.    Attorneys Fees and Costs.

448.    Injunctive relief to include:

    a.  Ordering Medicare to require Virginia to investigate all complaints made by the Van Puttens that have not been investigated.

    b.  Ordering Inova to remediate all unaddressed failures to comply with the Medicare Conditions of Participation.

    c.  Declaring unconstitutional the Virginia Medical Malpractice Act.

## VIII.   COUNT III –BIVENS CLAIM

449.        Plaintiff incorporates and restates the above paragraphs as if fully set forth herein.

450.        In <u>Bivens v. 6 Unknown Named Federal Agents,</u> 403 US 388 (1971), the Supreme Court recognized the right to sue federal actors for violations of constitutionally protected rights.

451.        The Medicare Defendants, all in their personal capacity, are employees of the federal government.

452.        The Virginia DOH Defendants were all acting under contract with the federal government, by and through Medicare.

453.        The Virginia QIO is a contractor of the United States with statutorily-defined responsibilities.

454.        The Inova Defendants are all federal contractors or the employees of a federal contractor.

455.        The Medicare Defendants, the Virginia DOH Defendants and the Inova Defendants jointly denied Sharon Van Putten of her right to life, liberty, the right to be free from bodily harm and torture under the UN Convention against Torture and other Cruel, Inhuman, or Degrading Treatment or Punishment, and the right to interstate travel, under the Fourth, Fifth and Fourteenth amendments to the Constitution, as well as Article II, Section II, Clause II.

    a.  The Convention against Torture, to which the US is a signatory, defines the involuntary administration of anti-psychotics, with government condoning, to constitute torture.

    b.  The Convention against Torture has been understood to extend to government supervision of facilities such as hospitals and the failure to provide health care services to institutionalized persons.

    c.  The Convention against Torture mandates that State Parties provide full compensation to torture victims.

    d.  The United States has represented that its current laws provide full remedy to torture victims and their families.

456.    The Medicare Defendants, the Virginia Defendants and the Inova defendants jointly denied Sharon Van Putten of equal protection of the law by failing to enforce regulations in order to unjustly and illegally protect Inova from the consequences of its illegal conduct.

457.    The Medicare Defendants, by refusing to promptly provide Sharon Van Putten of the results of the state inspection and by failing to provide Sharon Van Putten of any right to participate or appeal that decision denied Sharon Van Putten due process with respect to vested property rights in violation of the Fifth Amendment to the Constitution.

    a.  Sharon Van Putten had a right to Medicare benefits being provided by a qualified Medicare provider of her choice.

    b.  She was denied the right to choose which Medicare provider would provide her benefits.

    c.  She was wrongly forced to accept services from providers who were not qualified, per federal regulations in that they had already been found to be in violation of the Conditions of Participation and were violating the Conditions of Participation with respect to their care of Sharon Van Putten.

    d.  Medicare beneficiaries are afforded NO process whatsoever in the State survey process of their own complaints, even though the results of that process can affect vested rights.

458.      The Medicare Defendants, by failing to ensure that the QIO executed its obligations in accordance with existing statutes and regulations, denied Sharon Van Putten of life, liberty and property rights, without due process.

    a.  Sharon Van Putten had "Original Medicare" whereby she was legally obligated to pay 20% of Medicare allowed charges.

    b.  Had the QIO found that Inova's violations were gross and flagrant, the QIO would have been obligated to recommend sanctions and a mandatory sanction is that all charges related to the sanctioned poor care be disallowed.  For Sharon Van Putten, this meant $170,818 in personal liability that she has no means to challenge.

    c.  Federal law provides a beneficiary no avenue to participate by any means, whatsoever, in the QIO review process – a beneficiary is, under current practice, disallowed from even submitting evidence.

    d.  By the point in which the process a beneficiary is contacted, the QIO's decision is final and there is no right to contest even obvious factual errors.

459.      Both the Medicare Defendants, the Virginia Defendants, and Medicare deprived Sharon Van Putten of the right to access other vested property rights by failing to provide any means by which to promptly challenge the application of certain Medicare rules and provided no means to have Medicare immediately reverse charges for excessive care and care that did not meet minimum Medicare services:

    a.  Medicare statutes and regulations limit the total number of days of hospitalization for which it will provide reimbursement for any "spell of illness" to 150 days.  All hospitalization days over 90 carry a high co-insurance rate.

b. Had Sharon Van Putten not died of lung cancer, Inova's extremely poor care put her in jeopardy of exceeding that coverage limit and therefore at risk of having to pay for hospital care out of her own pocket. Such care would have bankrupted her and her husband nearly immediately. Sharon Van Putten was at the 69th day of hospitalization for one spell of illness at the day of her death.

c. Medicare limits the total number of days of skilled nursing care to 100 for each spell of illness, after which Sharon Van Putten would have been required to pay out of pocket. The skilled nursing included her rehabilitation, which if she had lived would have been extensive and would have exceeded the 100 day limit. Such care would have bankrupted her and her husband.

d. This issue is not moot because Medicare's lack of any process for beneficiaries to promptly challenge the right of providers to bill is ongoing and this issue is likely to evade review.

460.     Medicare failed to provide Sharon Van Putten with due process of law by having all access to Medicare appeals for withdrawal of care tantamount to a denial of benefits dependent on the hospital providing a notice and right to appeal.

a. The vesting of appeal rights cannot be within the sole discretion of an interested party with an adverse interest.

WHEREFORE, Sharon Van Putten respectfully requests that the Court issue the following relief:

461.     Damages in the amount of $1,031,352.64.

462.     Punitive damages in the amount of $450 million, the amount Inova obtained by Virginia reporting Inova to be in compliance with its obligations under Medicare when it was not.

463.     Attorneys fees and costs.

464.     Injunctive relief to include:

a.     Ordering Medicare and Virginia to provide due process for beneficiaries in state inspections under Medicare auspices and to contest findings.

b.     Ordering Medicare to provide due process to beneficiaries in the calculation of days of service so that the beneficiaries are not "charged" for days of care that do not meet Medicare minimum standards.

c.     Ordering Medicare to provide due process to beneficiaries in the QIO process, to include the right to present evidence and to disagree with findings before a decision is final, and to include the right to a prompt process in the event of exigent circumstances, to include 24/7 access to a complaint intake system with authority to resolve problems.

d.     Ordering Medicare to provide some means of promptly effectuating patient-initiated transfers in the event of a facility's refusal so that Medicare's DRG regulations are not used as a means to health care facilities to involuntarily detain patients.

e.     Ordering Medicare to enforce Medicare statutes and regulations related to patient quality, with especial attention to the issue of involuntary drugging of patients with mind altering substances and the involuntary restraint of patients.

f.   Ordering Medicare to revoke any current guidance telling QIOs to 'go easy' on hospitals.

g.   Ordering Medicare to require QIOs to recommend sanctions where there has been a gross and flagrant violation and to recommend sanctions commensurate with the obligation to prevent future harm to other beneficiaries.

## IX. COUNT IV – VIOLATION OF FREE SPEECH

465.      Plaintiff incorporates and restates the above paragraphs as if fully set forth herein.

466.      The Final Decision from the QIO threatened as follows:  "The information in this notice is confidential and may be redisclosed only in accordance with Federal Regulations found in 42 CFR Part 480.

467.      42 CFR Part 480 provides: Persons or organizations that obtain confidential QIO information must not further disclose the information to any other person or organization except—

> (a) As directed by the QIO to carry out a disclosure permitted or required under a particular provision of this part;
> (b) As directed by CMS to carry out specific responsibilities of the Secretary under the Act;
> (c) As necessary for CMS to carry out its responsibilities for appeals under section 1155 of the Act or for CMS to process sanctions under section 1156 of the Act;
> (d) If the health care services furnished to an individual patient are reimbursed from more than one source, these sources of reimbursement may exchange confidential information as necessary for the payment of claims;
> (e) If the information is acquired by the QIO from another source and the receiver of the information is authorized under its own authorities to acquire the information directly from the source, the receiver may disclose the information in accordance with the source's redisclosure rules;
> (f) As necessary for the General Accounting Office to carry out its statutory responsibilities;
> (g) Information pertaining to a patient or practitioner may be disclosed by that individual provided it does not identify any other patient or practitioner;

(h) An institution may disclose information pertaining to itself provided it does not identify an individual patient or practitioner;
(i) Governmental fraud or abuse agencies and State licensing or certification agencies recognized by CMS may disclose information as necessary in a judicial, administrative or other formal legal proceeding resulting from an investigation conducted by the agency;
(j) State and local public health officials to carry out their responsibilities, as necessary, to protect against a substantial risk to the public health; or
(k) As necessary for the Office of the Inspector General to carry out its statutory responsibilities.

468.    Penalties for an "unauthorized disclosure" are as follows: A person who discloses information not authorized under Title XI Part B of the Act or the regulations of this part will, upon conviction, be fined no more than $1,000, or be imprisoned for no more than six months, or both, and will pay the costs of prosecution.

469.    The first amendment to the Constitution provides: Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

470.    The above QIO non-disclosure law precludes free speech, impedes the right of assembly and thwarts the right to petition the government for redress of grievances, and is therefore unconstitutional.

471.    The above QIO non-disclosure law is so overbroad that technically it makes the clerk of this Court subject to criminal prosecution for providing the Court with a copy of this Complaint.

472.    The above QIO non-disclosure law is so overbroad that it makes this Court issuing an opinion referencing the contents of the final report a crime.

WHEREFORE, Sharon Van Putten respectfully requests that the Court issue the following injunctive relief:

473.        Declare the above QIO non-disclosure law unconstitutional with respect to any

person who receives a copy of the report from a beneficiary.

474.        Attorneys' fees and costs.

## X. VIOLATION OF CIVIL RIGHTS—DISCRIMINATION AGAINST THE DISABLED

475.        Plaintiff incorporates and restates the above paragraphs as if fully set forth herein.

476.        Defendant Inova is a public accommodation for the purpose of the ADA, pursuant

to 42 USC § 12181.

477.        Defendant Inova is also a federal contractor, receiving about 30% of its revenue

from the U.S. Government.

478.        Section 504 of the Rehabilitation Act provides:

No otherwise qualified individual with a disability in the United States, as defined in section
705(20) of this title, shall, solely by reason of her or his disability, be excluded from the
participation in, be denied the benefits of, or be subjected to discrimination under any
program or activity receiving Federal financial assistance or under any program or activity
conducted by any Executive agency or by the United States Postal Service.

479.        Sec. 12182 of the Americans with Disabilities Act provides: No  individual shall

be discriminated against on the basis of disability in the full and equal enjoyment of the goods,

services, facilities, privileges, advantages, or accommodations of any place of public

accommodation by any person who owns, leases (or leases to), or operates a place of public

accommodation.

480.        Inova deprived Sharon Van Putten of access to medical treatment and food on

account of her disabilities.

481.        Section Sec. 12132 of the Americans with Disability Act provides: Subject to the

provisions of this subchapter, no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

482. Upon information and belief, federal QIOs have a pattern, practice and policy of depriving disabled individuals of equal protection of the law.

WHEREFORE, Sharon Van Putten seeks the following relief:

483. Compensatory damages against Inova in the amount of $1,031,352.64.

484. Attorneys fees and costs.

485. Injunctive relief to include ordering Inova not to starve people because of a disability.

486. Injunctive relief to include ordering Medicare to ensure that QIOs do not downgrade or dismiss the damage caused to beneficiaries simply because of a beneficiary's status as a disabled person.

Respectfully Submitted,

Allen Van Putten, Executor for the Estate of
Sharon Van Putten
265 Cays Drive #2104
Naples, FL 34114
(703) 629-4726